[No. B040839. Second Dist., Div. Seven. Oct. 17, 1990.]

GHK ASSOCIATES, Cross-complainant and Respondent, v.
MAYER GROUP, INC., et al., Cross-defendants and Appellants.

**COUNSEL**

Rudin & Appel and Joseph L. Golden for Cross-defendants and Appellants.

Pritchard & Fields, Diane E. Pritchard and Craig M. Fields for Cross-complainant and Respondent.

**OPINION**

**WOODS (Fred), J.**—This is an appeal from a judgment of the Los Angeles County Superior Court, the Honorable Leon Savitch, Judge presiding, for respondent/cross-complainant GHK Associates, a general partnership, hereafter GHK, on the first (breach of contract), fourth (conspiracy), fifth (tortious interference with contract), and seventh (declaratory relief and constructive trust) causes of action of its first amended cross-complaint[1] against appellants/cross-defendants, Metropolitan Development Corporation, a California corporation, hereafter MDC; Mayer Group, Inc., a

---

[1] Judgment on GHK's cross-complaint was entered against the following cross-defendants: (a) against MGI, now owned by Coast, MDC, and MG, now known as Coast Fed Properties, on the first cause of action; (b) against MGI, MDC, FCP, Alan I. Casden, MG, Coast, PBL, MPBI, SPBI, and MMI on the fourth cause of action; (c) against FCP, Alan I. Casden, MG, Coast, PBL, MPBI, SPBI, and MMI on the fifth cause of action; (d) against MGI, MDC, FCP, Alan I. Casden, MG, Coast, PBL, MPBI, SPBI, and MMI on the seventh cause of action; (e) the second, third, sixth and eighth causes of action were dismissed.

California corporation, hereafter MGI; First City Properties, Inc., a Delaware corporation, hereafter FCP; Mayer Group, a general partnership, hereafter MG; Coast Savings and Loan Association, a California corporation, hereafter Coast; Coast Savings and Loan Association doing business as Coast Mortgage and Realty Investors, hereafter CMRI; Playa Blanca Ltd., a California limited partnership, hereafter PBL; Shearson Playa Blanca, Inc., a Delaware corporation, hereafter SPBI; Mayer Playa Blanca, Inc., a California corporation, hereafter MPBI; Mayer Management Inc., a California corporation, hereafter MMI; and Alan I. Casden, an individual. We affirm.

## I.

### INTRODUCTION

Pursuant to a written development agreement dated October 21, 1980, hereafter referred to as the "1980 Agreement," it was agreed that GHK would transfer a two-acre parcel of unimproved real property in Playa del Rey, hereafter referred to as the "Property," to MDC. MDC would develop and market the Property as an 80-unit residential condominium project, and GHK would receive 40 percent of the net profits of the project as defined in the 1980 Agreement. At the request of MDC and GHK, MDC and MGI entered into a July 1, 1981, amendment to the 1980 Agreement, hereafter referred to as the "First Amendment," whereby MGI assumed all of MDC's obligations under the 1980 Agreement.

Thereafter, MDC and MGI engaged in a series of transfers of the Property and the syndication and development of the Property as an apartment complex. GHK contends that FCP (the parent of MDC), MGI, Coast (a general partner of MG), CMRI (a wholly owned subsidiary of Coast), PBL, SPBI, and MPBI (general partners of PBL), MMI (the manager of the apartment complex), and Alan I. Casden (the president of MGI, MPBI and MMI and a general partner of PBL), were parties to the transfers and development of the Property, and undertook these actions with full knowledge of the rights of GHK under the agreements. Despite their development of the Property, GHK contends that the cross-defendants, acting in consort, refused to recognize any of GHK's rights under the agreements, including GHK's profit interest.

The trial court ruled, inter alia, that MDC and MGI materially breached the agreements, by (1) transferring the Property without GHK's consent; (2) encumbering the Property without GHK's consent; (3) failing to develop the Property as condominium units within the time required by the agreements; (4) failing to sell the completed units to independent third party purchasers; (5) failing to provide GHK with a project budget for the

project (Project); and (6) failing to pay GHK 40 percent of the profits (as defined by the agreements).

The trial court also found that MGI fraudulently induced GHK to enter into the First Amendment, and that all cross-defendants conspired with MDC and MGI to deprive GHK of its benefits under the agreements and all cross-defendants, exclusive of MDC and MGI, tortiously induced MDC and MGI to breach the agreements as set forth above.

The trial court found that GHK had suffered damages as the result of the action of the cross-defendants aforementioned. The trial court further determined that a proper measure of damages to be applied, under the circumstances of this case, was 40 percent of the net profits of the Project, as defined by the judgment.[2] To carry out the judgment, the trial court

---

[2] Paragraphs F through K of the judgment filed on December 8, 1988, provide as follows:

"F. GHK Associates shall receive and be paid by Mayer Group, Inc., Metropolitan Development Corporation, First City Properties, Inc., Alan I. Casden, Mayer Group, Coast Savings and Loan Association, Playa Blanca Ltd., Mayer-Playa Blanca, Inc., Shearson-Playa Blanca, Inc., and Mayer Management Company, jointly and severally, an amount equal to 40% of the net profits from the sale to the public of the units located at 8300 Manitoba Street, Playa del Rey, California, as well as an amount equal to 40% of the net rental income derived from the project from the time any of the units were first rented until the final sales of all of the units, with interest thereon at the legal rate from the date this judgment is entered.

"G. GHK shall receive and be paid on a monthly basis an amount equal to 40% of the net rental income of the project. The net rental income shall consist of the gross rents for the project less the actual amounts paid for the following items only: (a) 5% management fee, (b) utilities, (c) insurance, (d) real estate taxes, (e) advertising, (f) manager's salary, (g) licenses and permits, and (h) normal maintenance and repair. GHK shall receive and be paid interest at the legal rate on its 40% of the net rental income from the dates of receipt of such rental income up to the date this judgment is entered.

"H. GHK shall receive and be paid every two weeks (commencing with the sale of the first unit) an amount equal to 40% of the net profits of the units sold to the public. The net profits of the units shall consist of the aggregate sales price of the units that are sold less the following items only: (a) $7,130,311.00 as project costs, (b) reasonable real estate commissions actually paid in connection with such sales, (c) reasonable escrow and loan fees actually paid in connection with such sales, (d) transfer taxes actually paid, and (e) reasonable costs, actually incurred, of selling, advertising and marketing the units for sale.

"I. Cross-defendants shall sell the units as individual condominium units at or above what is reasonably believed by cross-defendants to be the units' then fair market value to independent third party purchasers.

"J. The Court imposes a constructive trust on the rents and the sales proceeds of and from the project.

"K. In order to carry the judgment into effect, the Court appoints Robert Crane of Crane/Sachar Realty & Management Co., at the sole expense of Mayer Group, Inc., Metropolitan Development Corporation, First City Properties, Inc., Alan I. Casden, Mayer Group, Coast Savings and Loan Association, Playa Blanca, Ltd., Mayer-Playa Blanca, Inc., Shearson-Playa Blanca, Inc., and Mayer Management Company, to render accountings and reports to the Court of the profits of the units that are sold and all rental income and expenses of the project. Robert Crane is authorized to conduct such investigation and discovery as may be necessary to locate and account for all rents, expenses, and sales proceeds and profits,

imposed a constructive trust, appointed a receiver, and ordered that accountings and reports be made to the court. MGI, MDC and MG were ordered to pay GHK's attorneys' fees in the sum of $203,365.50, together with costs of suits in the sum of $4,305.91. All cross-defendants filed a timely notice of appeal.

## II.

### QUESTIONS ON APPEAL

A. Did the trial court abuse its discretion in ruling that GHK is entitled to 40 percent of the net profits (as defined by the judgment) of the Project?

B. Does the record contain substantial evidence to support the trial court's calculation of the profits of the Project?

C. Did the trial court abuse its discretion in imposing a constructive trust on the proceeds of the Project?

D. Does the record contain substantial evidence to support the trial court's ruling that certain of the appellants conspired to induce breach of contract and tortiously interfered with the contracts?

E. Does the record contain substantial evidence to support the trial court's ruling that appellants Coast and MPBI are liable on the first amended complaint?

## III.

### PROCEDURAL AND FACTUAL SYNOPSIS

GHK Associates is a general partnership that was formed for the purpose of developing an 80-unit condominium project on an undeveloped piece of real property that it owned at 8300 Manitoba Street, Playa del Rey. GHK's partners at the time of trial were Patrick Higashi and James Kozen. Charles Gotanda was a former member of the partnership.

GHK purchased the Property in June 1980 from the Mormon Church for $2 million, $100,000 of which was paid in cash and the balance of which was represented by a note in favor of the Mormon Church. The Property was unique because it was a large parcel (2.01 acres) in proximity to the

and to engage and employ attorneys, accountants and other persons to assist in such investigation and discovery."

beach and zoned for multifamily housing. After purchasing the Property, GHK engaged an architect and engineer to design an 80-unit condominium building. GHK also approached several lending institutions to be a joint venture partner in the Project.

In the course of this process, GHK approached William Belzberg to be a passive investor in the Project. It was Belzberg who suggested that his holding company's subsidiary, MDC, actually do the development. Pursuant to the 1980 Agreement between GHK and MDC, MDC agreed that, in exchange for GHK's transferring the Property to MDC, MDC would develop the Property as an 80-unit condominium building and would pay GHK 40 percent of the net profits (as defined by the agreement) from the sale of the condominiums. Pursuant to the 1980 Agreement, title to the Property was transferred to MDC, MDC reimbursed GHK for its out-of-pocket costs of acquiring and developing the Property as of that time, and MDC assumed the $1.9 million Mormon Church loan.

Other material terms of the 1980 Agreement included:

1. MDC agreed not to sell the Property other than as provided for in the agreement.

2. "MDC shall use its best efforts to promptly develop the Property with an 80-unit residential condominium complex . . . and to sell the completed Units at or above what is reasonably believed by MDC to be their then fair market value to independent third party purchasers. Any sale to any MDC employee, agent, representative, subsidiary or related or affiliated person, firm or corporation shall require GHK's prior written consent."

3. Construction of the Project was to be finally completed and the condominiums ready for sale to the public within two years after commencement of construction. In the event the Project was not completed within that time period, MDC would receive no further sums to be paid pursuant to paragraph 5.5 of the agreement (interest on the construction costs being advanced by MDC).

4. MDC agreed to pay the entire cost of constructing and selling the condominiums and to provide GHK with a "project budget" before construction began. The project budget was to contain the actual or reasonably estimated project costs (as defined). GHK could object to the project budget.

5. MDC was to receive (a) a general contractor's fee of 6½ percent of the total estimated direct construction costs (as defined) as included in the

project budget to be approved by GHK, (b) 3 percent of the approved project budget, in exchange for agreeing to advance the projected construction costs, and (c) interest (imputed interest) on the project costs it advanced at the rate of prime plus 3 percent until the advances were repaid.

6. The "Net Sales Proceeds" (as defined) were to be distributed as follows: First, MDC was to be repaid the total "project costs" it had advanced, as defined in the agreement. Second, MDC was to receive the next $1.2 million. Third, GHK was to receive the next $800,000. And fourth, GHK and MDC were to divide the balance, if any, 60 percent to MDC and 40 percent to GHK. If the actual project costs exceeded the project budget approved by GHK by more than 15 percent, then the 60-40 profit split was to begin with the first dollar after MDC was repaid its project costs allowed by the agreement.

In or about January 1981, Rudolph Schaefer, the president of MDC, introduced GHK to representatives of MGI, for the purposes of having MGI take over the development of the Project from MDC. One of the representatives of MGI was its president, appellant Alan I. Casden.

Alan I. Casden suggested that, as part of the transfer of the development responsibilities from MDC to MGI, the 60-40 profit split between MDC and GHK be changed to 70-30, with MDC/MGI to receive 70 percent and GHK's share to be reduced to 30 percent. Alan I. Casden stated to GHK, and internal memoranda of MGI reveal, that MGI wanted a larger cut of the profits (as much as 75-25 in its favor) to give it "more incentive" to make profits on the Project.

GHK advised MDC and MGI by letter that it would not acquiesce to MGI's proposed change in the profit split.

On or about July 1, 1981, GHK, MDC and MGI entered into the First Amendment to the 1980 Agreement, whereby MGI took over the development of the Project from MDC, although MDC remained liable to GHK for the full performance of its obligations under the agreements. Alan I. Casden's brother, Henry Casden, an attorney, represented MGI in connection with the First Amendment transfer of the Property to MGI.

Other material terms of the First Amendment include the following:

1. It was specifically recited that GHK had performed all of its obligations under the 1980 Agreement as amended by the First Amendment.

2. Any further transfers of the Property and/or assignment of MDC/MGI's rights and obligations were subject to GHK's prior written

consent, "it being understood that a material part of the consideration passing to GHK under this Amendment is the personal performance by MDC or Mayer [MGI] of all obligations hereunder."

3. MDC/MGI warranted that they would use their best efforts to deliver a project budget to GHK and to commence construction no later than one year from the date of the 1980 Agreement, that is, by October 20, 1981.

4. Although the principal and the interest on the Mormon Church loan were deemed to be a "project cost" within the definition of the 1980 Agreement, (i) only payments of principal on that loan were to be included in the amount to be charged with "imputed interest" payable to MDC/MGI, (ii) the "imputed interest" on this item (which was differentiated from the "imputed interest" chargeable on other project cost items) would be at the rate of the lesser of 17 percent or prime plus 3 percent; and (iii) neither the principal nor the interest payments were to be considered "project costs" for purposes of calculating the 6½ percent contractor's fee and the 3 percent fee payable to MDC/MGI pursuant to paragraphs 5.3 and 5.4, respectively, of the 1980 Agreement.

Prior to the execution of the First Amendment, MDC had prepared analyses of the Project to determine how the condominium units should be priced, and studies of the surrounding market were conducted to determine how the Project could be marketed profitably as condominiums. MDC's internal analysis indicated that Playa del Rey real estate was experiencing dramatic (24 percent per year) increased market values and that the Project had "strong potential for development." MDC's internal analysis indicated potential net pretax profits for the Project of $3,412,600.

Following the execution of the First Amendment, GHK repeatedly sought, but did not receive, status reports on the Project and the project budget for the Project. In or about March 1982, after repeated unsuccessful attempts to obtain status reports and a project budget, Mr. Kozen of GHK called Alan I. Casden's office and demanded a meeting. In March 1982, Messrs. Kozen and Higashi of GHK met with Alan I. Casden and Daniel Salceda, a vice-president of MGI, at MGI's offices. Mr. Salceda showed Messrs. Kozen and Higashi a set of preliminary architectural plans for the Project and said that a project budget was not yet complete. Alan I. Casden claimed during that meeting that because of the increase in interest rates the Project was not financially viable. However, out of the presence of Alan I. Casden, Mr. Salceda told Mr. Kozen to be careful "and to hold onto your testicles and your wallet because Alan Casden will screw you."

Alan I. Casden failed to mention to GHK, at the March 1982 meeting, that he had already transferred the Property to appellant FCP (without

GHK's knowledge or consent). Shortly after that meeting, on June 29, 1982, again without the knowledge or consent of GHK, FCP transferred the Property to appellant MG. Henry Casden represented Alan I. Casden, MGI and MG in connection with the transaction.

After the March 1982 meeting, GHK continued to make inquiries regarding the status of the Project. Because GHK did not receive any responses to its inquiries, it sent a letter, on March 22, 1983, to MDC and MGI demanding a progress report. Not only was GHK unaware of the transfers of the Property, but it was also unaware that in March 1983, MG had entered into a commitment for a $5 million loan with California Federal Savings, the lender under the City of Los Angeles loan to lender program, to develop the Project as an apartment complex. According to this loan commitment, 20 percent of the units had to be set aside for low-income rental housing, and the Project could not be converted to and sold as condominium units for at least seven years.

Alan I. Casden, on behalf of MGI, responded to GHK by letter of May 3, 1983. The letter failed to mention the transfers of the Property first to FCP and subsequently to its then-owner, MG, and stated that "we now think it advisable to build an apartment project on this site." This was the first time Alan I. Casden had ever raised the concept to GHK of building an apartment project on the Property. However, MG had already contractually obligated itself to do so.

The Alan I. Casden letter to GHK also enclosed an "80-unit Condominium Proforma" that purported to show a net loss on the Project, based on projected sales prices of condominiums.

On May 20, 1983, GHK responded by letter disputing the points raised in Alan I. Casden's May 3, 1983, letter, including the assertion that the Project was not economically viable. Other condominium projects were in fact moving forward in Playa del Rey during this time frame.

After sending the May 20, 1983, letter, in May 1983, Mr. Kozen of GHK drove by the Property and was surprised to see a billboard advertising an 80-unit *apartment building* that was to be built on the Property and financed by a City of Los Angeles bond issuance. Mr. Kozen confirmed this with a title company, the City of Los Angeles, and FCP (who was mentioned in a title report), and then called Alan I. Casden and confronted him with what he had discovered. Mr. Casden denied that he was building an apartment project.

GHK filed its cross-complaint shortly thereafter against appellants MDC, MGI, FCP, MG, CMRI and Alan I. Casden, alleging, inter alia, that

the failure to timely commence construction of the Project, the transfers of the Property from MGI, the failure to provide a project budget, and the development of the Property as apartments were breaches of the agreements. The cross-complaint sought damages based on the breaches and appellants' fraud, conspiracy and tortious interference with the agreements, as well as rescission of the agreements. GHK alleged that its damages, based on a March 1981 profit share analysis performed by *MGI* "were projected to be in excess of $1,054,000.00." Henry Casden's law firm represented appellants in the suit.

GHK recorded a lis pendens against the Property. On September 26, 1983, the court denied appellants' motion to expunge the lis pendens on condition that GHK post a $2 million bond by October 11, 1983. GHK could not afford to post such a bond, and the lis pendens therefore was expunged on October 11, 1983.

On or about June 1, 1984, MG transferred the Property to PBL—in connection with the syndication—for $5,321,173, which was in the form of PBL's assumption of the $5 million California Federal Savings loan and the rest as cash at the closing and installment payments. In addition, MG-related entities received at least $1,021,500, plus other "indeterminable" commissions, fees and other expenses. MMI was to receive all or part of the revenues of the Project through 1987. The general partners of PBL—Alan I. Casden, SPBI, and MPBI—also were to receive at least 4 percent and potentially up to 25 percent of the net proceeds of the disposition or partial disposition of the Property after the limited partners had received their priority return on their investment. Appellant SPBI and its parent company, Shearson, were to receive at least $355,000 plus other "indeterminable" commissions, fees and other expenses.

Henry Casden's law firm represented MG in connection with the transfer of the Property to PBL, and was the author of the PBL partnership agreement and private placement memorandum (Private Placement Memorandum).

The Private Placement Memorandum did not reference GHK's interest in the Property or the pendency of the lawsuit. The Private Placement Memorandum stated that MG had purchased the Property from an "unaffiliated third party" in 1981. MG did not exist in 1981, and the "unaffiliated third party," FCP, is affiliated with MG according to appellants' opening brief. Alan I. Casden's testimony regarding this misstatement in the Private Placement Memorandum was as follows: "Big deal. It is inaccurate."

Construction of the apartment complex was completed in 1984 and the units were rented out as apartments. A final tract map for condominium purposes was recorded for the Property.

On December 4, 1985, GHK amended its cross-complaint to add PBL, MPBI, SPBI, MMI, and Coast as cross-defendants. In addition to the breaches of contract, fraud, conspiracy and tortious interference alleged in the original cross-complaint, GHK alleged that the development of the Project as apartments with financing which precluded the sale of the units as condominiums and MG's sale of the Property to PBL, were further breaches of the agreements. GHK also alleged that Alan I. Casden, MG and the newly added appellants had conspired to deprive GHK of the benefits of the agreements and tortiously interfered with the agreements.

On February 3, 1988, GHK moved for summary adjudication of the issue, among others, of whether the transfers from MGI to FCP, from FCP to MG, and from MG to PBL, or any of them, were breaches of the agreements. On March 16, 1988, the Los Angeles Superior Court, the Honorable Dzintra Janavs presiding, granted that motion in part, finding that those transfers were material breaches. On March 22, 1988, in the course of denying appellants' cross-motion for summary adjudication of issues, Judge Janavs found that MGI's failure to market the Property as condominiums to independent third party purchasers also constituted a breach of the agreements.

The issue of damages and GHK's other causes of action were left for trial, which was held before the Honorable Leon Savitch, sitting without a jury, from June 10-22, 1988.

The trial court took the matter under submission on June 22, 1988, and issued its tentative decision on July 26, 1988. The trial court found against appellants on the first (breach of contract), fourth (conspiracy), fifth (tortious interference with contract), and seventh (imposition of constructive trust) causes of action. With respect to GHK's damages, the court found that "the actual damages suffered by G.H.K. are too difficult to determine at this time with requisite certainty and declares that G.H.K. shall receive and be paid 40% of the net profits of the condominium units that are actually sold to the public as well as 40% of the net rental income pertaining to the project until the final sales of all condominiums."

The trial court also imposed a constructive trust on the rents and ultimate sales proceeds of the Project. The trial court further found that it was necessary, in order to carry the judgment into effect, to appoint a qualified

person to render accountings and reports to the court regarding the rents and sales proceeds for the Project. Pursuant to paragraph K of the judgment, Crane/Sachar Realty & Management Co. (now known as Crane Realty Services) was appointed to render accountings and reports concerning the amounts to be paid GHK. The statement of decision and judgment carefully delineate how the net rental income and net profits from the sale of the units is to be computed.

With respect to the trial court's findings that GHK was entitled to 40 percent of the net profits of the sales of the units to the public, the statement of decision and judgment state that the net profits of the units consist of the "aggregate sales price of the units that are sold," less (a) $7,130,311 (which the trial court found was the total of the project costs pursuant to the terms of the agreements), (b) reasonable real estate commissions actually paid in connection with such sales, (c) reasonable escrow and loan fees actually paid in connection with such sales, (d) transfer taxes actually paid, and (e) reasonable costs, actually incurred, of selling, advertising and marketing the units for sale (which the trial court found were the allowable project costs pursuant to the agreements).

The trial court refused to include interest on the California Federal Savings loan (though the court included the entire principal amount of the loan) as a project cost because: (1) interest on this type of loan is not a "project cost" under the agreements; (2) the agreements excluded actual interest on financing obtained by MDC or MGI and substituted a formula for "imputed interest"; (3) the agreements provided that MDC and MGI were to receive no further sums as interest if the Project was not completed and ready for sale to the public within two years from the commencement of construction (which it was not); (4) the loan itself constituted a breach of the agreements; and (5) appellants failed to present any evidence as to the amount of interest that they were paying on the California Federal Savings loan.

With respect to the trial court's finding that GHK was entitled to 40 percent of the net rental income of the Project, the statement of decision and judgment state that the net rental income shall consist of gross rents less the actual amounts paid for the following items: (a) 5 percent management fee, (b) utilities, (c) insurance, (d) real estate taxes, (e) advertising, (f) manager's salary, (g) licenses and permits, and (h) normal maintenance and repair.

Appellants filed objections challenging the statement of decision and then a motion for new trial, raising numerous defenses to the breaches of the

agreements (which are not raised on appeal) and making the arguments presented in their opening brief on appeal. Judgment was entered in this matter on December 8, 1988, and the court served the parties with notice of the entry of judgment and a copy of the judgment on that day. Appellants' motion for new trial was denied on February 21, 1989. Appellants' notice of appeal was filed on March 17, 1989, and the self-styled "Specially Appearing Appellants" filed their notice of appeal on March 22, 1989.

## DISCUSSION

### A. *Standard of review.*

Appellants attack the trial court's judgment as unsupported by the evidence or as erroneous as a matter of law. ■■ But an appellate court must accept as true all evidence tending to establish the correctness of the judgment, taking into account all inferences which might reasonably have been thought by the trial court to lead to the same conclusion. (*Roberts* v. *Salot* (1958) 166 Cal.App.2d 294, 296 [333 P.2d 232].) Every substantial conflict in the testimony is to be resolved in favor of the judgment. (*Bancroft-Whitney Co.* v. *McHugh* (1913) 166 Cal. 140, 142 [134 P. 1157].) Thus, the judgment of the trial court is presumed to be correct. All presumptions not contradicted by the record on appeal are indulged to support the judgment, and the appellant has the burden to affirmatively show, based on the record, the trial court's commission of reversible error. (See, e.g., *Walling* v. *Kimball* (1941) 17 Cal.2d 364, 373 [110 P.2d 58]; *Ellis* v. *Roshei Corp.* (1983) 143 Cal.App.3d 642, 645, fn. 2 [192 Cal.Rptr. 57].)

In determining whether there is any substantial evidence to sustain the judgment, the appellate court will look only at the evidence supporting the prevailing party and will disregard the contrary showing; the evidence is not to be weighed by the appellate court: "All of the evidence most favorable to the respondent must be accepted as true, and that unfavorable discarded as not having sufficient verity, to be accepted by the trier of fact. If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed." (*Estate of Teel* (1944) 25 Cal.2d 520, 527 [154 P.2d 384].)

■■ Moreover, appellants cannot raise claims at the appellate level as grounds for reversal if they did not bring them to the attention of the trial court. (E.g., *Doers* v. *Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184, fn. 1 [151 Cal.Rptr. 837, 588 P.2d 1261].)

B. *The measure of damages employed by the trial court was not an abuse of discretion and does not violate California Civil Code sections 3300, 3301, or 3358.*[3]

 Appellants have not demonstrated that the trial court abused its discretion in applying a measure of damages that the court determined to be appropriate under the circumstances of this case. Furthermore, the record contains substantial evidence to support the damages awarded in the judgment. First, there is substantial evidence to support the trial court's finding that GHK was in fact damaged by the breaches of the agreements. Under the terms of the agreements, GHK was entitled to 40 percent of the net profits of the Project (as defined by the agreements). There is substantial evidence in the record to support the trial court's finding that MDC and MGI breached the agreements by, among other things, failing to develop the Property as a condominium project, and instead, through an entity controlled by MGI and Alan I. Casden, developing the Property as an apartment complex and then syndicating the project through a limited partnership. It is undisputed that GHK received nothing from the Project. There is substantial evidence in the record that the condominium project would have resulted in a profit to MDC/MGI and GHK if appellants had not breached the agreements.

Second, with respect to the measure of damages, the trial court found that *because of the activities of appellants*, the actual amount of the damages suffered by GHK is too difficult to determine at this time with requisite certainty. Contrary to appellants' argument, this finding does not constitute a "failure of proof" by GHK, and does not necessitate an award of nominal damages, only, to GHK.

 Where the *fact* of damages is certain, the amount of damages need not be calculated with absolute certainty. (*Channell* v. *Anthony* (1976) 58 Cal.App.3d 290, 317 [129 Cal.Rptr. 704]; *Noble* v. *Tweedy* (1949) 90 Cal.App.2d 738, 745-746 [203 P.2d 778].) The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation. (*Allen* v.

---

[3] Civil Code section 3300 reads as follows: "For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."

Civil Code section 3301 reads as follows: "No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and origin."

Civil Code section 3358 reads as follows: "Except as expressly provided by statute, no person can recover a greater amount in damages for the breach of an obligation, than he could have gained by the full performance thereof on both sides."

*Gardner* (1954) 126 Cal.App.2d 335, 340 [272 P.2d 99].) This is especially true where, as here, it is the wrongful acts of the defendant that have created the difficulty in proving the amount of loss of profits (*Ramona Manor Convalescent Hospital* v. *Care Enterprises* (1986) 177 Cal.App.3d 1120, 1140 [225 Cal.Rptr. 120]) or where it is the wrongful acts of the defendant that have caused the other party to not realize a profit to which that party is entitled. (*Mann* v. *Jackson* (1956) 141 Cal.App.2d 6, 12 [296 P.2d 120]. See also *James* v. *Herbert* (1957) 149 Cal.App.2d 741, 749 [309 P.2d 91] [Damages consisting of plaintiff's lost anticipated profits from real estate development joint venture, in which defendants had conspired to deprive plaintiff of her share of the profits from the venture, need not be established with certainty, so long as there was reasonable probability profits would have been earned but for the breach of contract.].)

Indeed, in *Ramona Manor Convalescent Hospital* v. *Care Enterprises, supra*, 177 Cal.App.3d 1120, 1140, the court found it appropriate that plaintiff's loss of profits be measured by *defendant's actual profits* where the jury found that defendant, a holdover tenant, had interfered with plaintiff's contractual relationship with the landlord to lease the premises occupied by defendant.

■ The selection of which measure of damages to apply is within the sound discretion of the trier of fact. (*Carlson Industries* v. *E. L. Murphy Trucking Co.* (1985) 168 Cal.App.3d 691, 699 [214 Cal.Rptr. 331].) ■ In this case, the trial court dealt with the difficulty of arriving at a precise figure for GHK's damages—which difficulty was created solely by appellant's wrongful acts—by awarding GHK its share of profits (calculated under the agreements) from the *actual* income from the Project, just as the court did in *Ramona*. Appellants have not demonstrated that this application by the trial court of what was essentially a conservative measure of damages was an abuse of discretion.

Appellants' argument that the judgment violates California Civil Code sections 3300 and 3358 is unmeritorious. To accept appellants' argument—which is a *factual* argument—that GHK suffered no loss as a result of appellants' many breaches of the agreements would require this court to reweigh the evidence and reverse the trial court's factual findings, because the trial court *found*, as a factual matter (rejecting the opinion of appellants' expert witness, Mosich), that GHK *had* been damaged by the breaches. And there is absolutely *no evidence in the record* that GHK will recover under the judgment a greater amount in damages than it would have gained by appellants' full performance under the agreements. On the contrary, by making an award of damages that is derived from the *actual* profits of the Project, the trial court applied a measure of damages that is conservative,

cannot possibly serve to penalize appellants, and is the closest possible approximation of GHK's actual damages under the circumstances of the case.

### C. The measure of damages employed by the trial court does not violate the principles of Coughlin v. Blair.

Appellants' attempt to analogize the facts of this case to those of *Coughlin* v. *Blair* (1953) 41 Cal.2d 587 [262 P.2d 305] and *Alder* v. *Drudis* (1947) 30 Cal.2d 372 [182 P.2d 195] is unavailing. First, those cases involved the situation of plaintiff's election to treat *defendant's* repudiation of the contract as an anticipatory breach which excuses *plaintiff's* own performance. In the instant case, however, appellants are trying to argue that *GHK's* "repudiation" of the agreements (by the filing of the cross-complaint) excused *appellants'* (cross-defendants') performance under the agreements. Second, the instant case does not present the issue of anticipatory breach. Third, GHK had already performed all of its obligations under the agreements at the time of appellants' breaches, so the cross-complaint is not a substitute for GHK's performance. Finally, appellants *themselves* did not treat GHK's filing of its cross-complaint as a "termination" of the agreements, but rather stated, in June 1983, that they would continue to honor the agreements and pay GHK its profit participation in the Project (as then being developed as an apartment complex).

*Coughlin* involved a situation not present here for another reason: where defendant/seller breached its agreement to build promised improvements to land and plaintiff/buyer brought suit, the court denied the *defendant (the breaching party)* credit for improvements the defendant had made after suit was brought on the rationale that "[p]arties who have totally breached a contract cannot force performance on the injured parties." (*Coughlin* v. *Blair, supra*, 41 Cal.2d at p. 603.) Appellants have again reversed the parties, in *Coughlin*, in attempting to analogize that case to the instant case in that appellants are claiming that GHK (the injured party) is attempting to force appellants (the breaching party) to perform under the agreements.

### D. The award of profits of the Project was proper.

■ Appellants' argument that the award of profits of the Project was erroneous because the contemplated condominium project was a "new business," and that GHK introduced no evidence of comparable ventures, is fallacious. There is substantial evidence in the record to support the trial court's finding that the contemplated condominium project would have resulted in a profit to MDC/MGI and GHK had appellants not breached

the agreements. What appellants seek to do is to have this court reweigh the evidence on this point.

Furthermore, there is substantial evidence in the record that it was appellants' actions that created the difficulty in establishing the exact amount of GHK's lost profits under the Project. The result is not, as appellants assert, that this case is governed by the "general principles" that the loss of anticipated profits from a new business is too speculative and conjectural to permit recovery. The result is that the trial court applied a measure of damages that is based on the *actual* income of the Project, which is the closest approximation to GHK's actual damages as can be determined under the circumstances of appellants' breaches.

E. *There is no evidence to support appellants' argument that GHK will recover under the judgment a greater amount than it would have gained had the agreements been fully performed.*

Although appellants now claim that the condominium project was a "new business" and the loss of anticipated profits is too speculative and conjectural, *appellants' own projections* in 1981 (based on MDC's analysis of the Playa del Rey real estate market) indicated potential net profits for the Project, *by 1984*, of anywhere between $2,635,000 and $3,412,600. There is no evidence in the record that GHK will receive under the judgment a greater amount than it would have gained had the agreements been fully performed, let alone a greater amount than projected by appellants in 1981 to be received sometime in *1984*.

Appellants base their argument *solely* on the Weir and Fecht report, which this court refused to allow to be added to the record on appeal by its June 5, 1990, order. This report was prepared on March 21, 1990, two years *after* the trial upon which this appeal is brought. Furthermore, this report was not received in evidence at trial or relied upon by the trial court, and therefore is outside of the scope of review. (*Lady* v. *Barrett* (1941) 43 Cal.App.2d 685, 687 [111 P.2d 702].)

F. *There is substantial evidence in the record to support the trial court's calculation of net profits.*

■ Appellants argue that the trial court improperly calculated the project costs under the agreements because it did not include interest on the California Federal Savings loan as a project cost. There is substantial evidence in the record to support the trial court's refusal to include this as a "project cost," as stated above, because: (1) interest on this type of loan is not a "project cost" under the agreements; (2) the agreements excluded

actual interest on financing obtained by MDC or MGI and substituted a formula for "imputed interest"; (3) the agreements provided that MDC and MGI were to receive no further sums as interest if the Project was not completed and ready for sale to the public within two years from the commencement of construction (which it was not); and (4) the loan itself constituted a breach of the agreements. In any case, appellants failed to present any evidence as to the amount of interest that they were paying on the California Federal Savings loan. (See *Seaboard Music Co.* v. *Germano* (1972) 24 Cal.App.3d 618, 622 [101 Cal.Rptr. 255].)

With respect to appellants' claim that GHK's own expert witness (Mr. Sayles) testified that this interest was a "proper deduction," appellants misconstrue Mr. Sayles's testimony. Mr. Sayles credited appellants with the *projected* (not actual) interest payments on the California Federal Savings loan only because his calculation of profits was based on appellants' own numbers, as contained in the private placement memorandum (which credited appellants with the projected interest)—not because the interest is a proper project cost under the agreements.

G. *The measure of damages employed by the trial court for the fourth and fifth causes of action was proper.*

■ The trial court employed a proper measure of damages with respect to the first cause of action (breach of contract) of the first amended cross-complaint. The trial court used the same measure of damages against the appellants named in the fourth (conspiracy to induce breach of contract) and fifth (tortious interference with contract) causes of action. There is no issue of duplicate recovery here. Appellants claim that GHK's recovery under the fourth and fifth causes of action is violative of the limitations set forth in California Civil Code section 3333.[4] We find no such violation since the measure of damages under the fourth and fifth cause of action is coextensive with GHK's recovery on its contract claims.

H. *The trial court did not abuse its discretion in imposing a constructive trust on the proceeds of the Project.*

■ GHK is entitled to a constructive trust on the rents and sales proceeds of and from the Project, based on findings of the trial court in its statement of decision regarding the wrongful activities of appellants. ■ The propriety of granting equitable relief of imposition of a

---

[4] Civil Code section 3333 reads as follows: "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."

constructive trust rests within the sound discretion of the trial court. (*Hicks v. Clayton* (1977) 67 Cal.App.3d 251, 265 [136 Cal.Rptr. 512].) As stated in *Martin v. Kehl* (1983) 145 Cal.App.3d 228, 237-238 [193 Cal.Rptr. 312]: "The principal constructive trust situations are set forth in Civil Code sections 2223 and 2224. Section 2223 provides that '[o]ne who *wrongfully* detains a thing is an involuntary trustee thereof, for the benefit of the owner.' (Italics added.) Section 2224 provides that: '[o]ne who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, *or other wrongful act*, is, unless he has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it.' (Italics added.) The only conditions necessary to create a constructive trust are those stated in the above sections. [Citations.] In order to provide the necessary flexibility to apply an equitable doctrine to individual cases, these sections state general principles for a court's guidance rather than restrictive rules. [Citation.] Thus, it has been pointed out that 'a constructive trust may be imposed in practically any case where there is a wrongful acquisition or detention of property to which another is entitled.' [Citations.]"

Fraud or intentional misrepresentation is not required for a constructive trust to be imposed. (*Calistoga Civic Club v. City of Calistoga* (1983) 143 Cal.App.3d 111, 116 [191 Cal.Rptr. 571].) A breach of contract or intentional interference with contract can make the offending party a constructive trustee. (See, e.g., *Neet v. Holmes* (1944) 25 Cal.2d 447, 464-466 [154 P.2d 854]; *Weiss v. Marcus* (1975) 51 Cal.App.3d 590, 600 [124 Cal.Rptr. 297].) ■ The trial court in this case found that appellants had conspired to deprive GHK of its rights under the agreements and its profit interest in the Project. Accordingly, the trial court acted well within its discretion in imposing a constructive trust on those profits for the benefit of GHK. (See, e.g., *Elliott v. Elliott* (1964) 231 Cal.App.2d 205, 209 [41 Cal.Rptr. 686]; *Niles v. Louis H. Rapoport & Sons* (1942) 53 Cal.App.2d 644 [128 P.2d 50].)

Appellants' argument that the trial court should not have imposed a constructive trust rests, again, on five unmeritorious arguments. First, appellants cite *Allen v. Powell* (1967) 248 Cal.App.2d 502 [56 Cal.Rptr. 715, 29 A.L.R.3d 1218], for the proposition that because a constructive trust is an equitable remedy, the plaintiff's remedy at law must be inadequate. However, the dictum in *Allen* that plaintiff's remedy at law must be inadequate was specifically rejected by this appellate court in the case of *Heckmann v. Ahmanson* (1985) 168 Cal.App.3d 119, 134, footnote 8 [214 Cal.Rptr. 177].

Second, notwithstanding appellants' claim to the contrary, GHK has established the essential elements for imposition of a constructive trust with

respect to MDC, MGI, MG and PBL. California Civil Code sections 2223 and 2224, respectively, provide that one who "wrongfully detains a thing" or one who "gains a thing by fraud . . . *or other wrongful act*, is, unless he or she has some other and better right thereto, an involuntary trustee . . . ." (Italics added.) The trial court found that MDC violated the agreements as set forth in the statement of decision, by, among other things, transferring the Property without GHK's consent and constructing an apartment project without paying GHK any of its profit interest under the agreements. The trial court found that MGI violated the agreements in the same manner as did MDC, but MGI also fraudulently induced GHK to consent to the transfer of the Property to MGI. The trial court found that MG and PBL conspired with the other appellants, and tortiously interfered with GHK's rights under the agreements by, among other things, their respective roles in the transfers of the Property and the development of the apartment project.

Third, contrary to appellants' mischaracterization, it is not the *Property* on which GHK has a constructive trust, it is the *rents and profits* derived from the Project constructed on the Property.

Fourth, the expungement of the lis pendens, because GHK could not post a $2 million bond, is irrelevant to the issue whether a constructive trust is proper against PBL, who is a party to this action. This is not a situation where GHK seeks to bind a *nonparty* to a judgment solely on the basis that the entity received constructive notice of a lawsuit affecting real property by way of a lis pendens recorded against the property. (See *Urez Corp.* v. *Superior Court* (1987) 190 Cal.App.3d 1141, 1144 [235 Cal.Rptr. 837].) This is the basis on which *Knapp Development & Design* v. *Pal-Mal Properties, Ltd.* (1987) 195 Cal.App.3d 786 [240 Cal.Rptr. 920] is distinguishable from the instant case. Although the expungement of a lis pendens wipes out *constructive notice* of a lawsuit under California Code of Civil Procedure section 409.8, the expungement does not insulate from a *damages award* (based on lost profits) a subsequent purchaser of the Property—PBL— which, with actual knowledge of GHK's contractual rights, purchased the Property and conspired to develop the Project in derogation of GHK's rights under the agreements.

Finally, appellants attempt to create an additional legal requirement for the imposition of a constructive trust against PBL, and confuse the trust res, by arguing that the constructive trust against the profits in PBL's possession was not proper because PBL did not acquire the *Property* itself from GHK. However, California Civil Code sections 2223 and 2224 do not require that the involuntary trustee acquire the trust res directly from its rightful owner, as a prerequisite for imposition of a constructive trust. In

any case, it is not the *Property*, but rather the rents and profits derived from the Project, on which the constructive trust has been imposed. Furthermore, PBL was found liable of committing the independent wrongs of conspiring to deprive GHK of the benefits of the agreements and tortiously interfering with GHK's rights under the agreements.

I. *The trial court did not order the Property sold as condominiums.*

The judgment does not require PBL to sell the Property as individual condominiums. Paragraph I simply governs the terms under which PBL must sell the condominium units *if* it sells them: to independent third party purchasers, at or above what is reasonably believed by appellants to be the units' then fair market value.

Appellants' argument that the judgment must be vacated because the court's supervision is required to enforce it is also unavailing. Cases interpreting this "archaic" rule since *Thayer Plymouth Center, Inc.* v. *Chrysler Motors Corp.* (1967) 255 Cal.App.2d 300 [63 Cal.Rptr. 148] have recognized that this rule is generally limited to building construction contracts and distribution agreements (as in *Thayer*) or sales agency agreements, and that the rule should not be extended. (*Okun* v. *Morton* (1988) 203 Cal.App.3d 805, 820-821 [250 Cal.Rptr. 220]; *Ellison* v. *Ventura Port District* (1978) 80 Cal.App.3d 574, 580-581 [145 Cal.Rptr. 665].) The apartment building in this case was constructed and leased well before the entry of the judgment, and the judgment does not require any construction with respect to the Property. Rather, the judgment simply requires that GHK be paid its profit interest in the Project as defined by the judgment, and that the condominiums be sold (if and when they are sold) as provided for by the agreements. The "archaic" rule cited by appellants should not be extended to this situation. (See, e.g., *Okun* v. *Morton, supra*, 203 Cal.App.3d at pp. 820-821.)

 Furthermore, the trial court may properly reserve continuing jurisdiction to amend a judgment to insert the amount of additional damages when those amounts are determined. (*Carlson Industries* v. *E. L. Murphy Trucking Co., supra*, 168 Cal.App.3d 691, 699.)

Finally, the judgment *does* provide an offset against GHK's share of the net profits from the sales of the condominium units of the following anticipated expenses in connection with the marketing and remodeling of the Property: "(a) $7,130,311.00 as project costs, (b) reasonable real estate commissions actually paid in connection with such sales, (c) reasonable escrow and loan fees actually paid in connection with such sales, (d)

transfer taxes actually paid, and (e) reasonable costs, actually incurred, of selling, advertising and marketing the units for sale."

J. *There is substantial evidence in the record to support the finding that appellants are separate entities for the purpose of conspiracy liability and that SPBI had knowledge of the conspiracy.*

██ Appellants cannot have it both ways: they cannot claim that they are "affiliated" where it suits some purposes, but claim that they are not affiliated where it suits other purposes. In order to argue that certain of the appellants cannot be coconspirators in the circumstances of this case, appellants claim they are "affiliated," notwithstanding that (1) appellants present no legal authority for the proposition that purportedly "affiliated" entities such as parent and subsidiary corporations or general partners of a partnership are not separate entities for conspiracy liability in this circumstance, and (2) appellants for other purposes, characterize themselves as "unaffiliated." Furthermore, although some of the appellants are as closely affiliated as parent-subsidiary corporations (such as FCP and MDC, or Coast and CMRI), it cannot be credibly argued that FCP and Coast or CMRI, for example, are so closely affiliated in any sense that they are not separate entities for the purposes of conspiracy liability. Likewise, it cannot be credibly argued that FCP, Coast or CMRI and SPBI, or SPBI and MMI, or Coast or CMRI and Alan I. Casden, are so closely affiliated that they are not separate entities for purposes of conspiracy liability.

Conspiracy only takes two. (*Peskin* v. *Squires* (1957) 156 Cal.App.2d 240, 246 [319 P.2d 405].) Here, there is substantial evidence in the record to support the trial court's finding that appellants conspired to deprive GHK of its rights under the agreements. There is also substantial evidence in the record that *each* of the appellants had knowledge of GHK's rights under the agreements either directly or by imputation of the knowledge of their officers or general partners, such as Alan I. Casden, (see, e.g., *Clark Equipment Co.* v. *Wheat* (1979) 92 Cal.App.3d 503, 527 [154 Cal.Rptr. 874]; *Trane Co.* v. *Gilbert* (1968) 267 Cal.App.2d 720, 727 [73 Cal.Rptr. 279]; *Beab, Inc.* v. *First Western Bank & Tr. Co.* (1962) 204 Cal.App.2d 680, 689 [22 Cal.Rptr. 583]; Civ. Code, § 2332; Corp. Code, §§ 15009, 15013.[5])

---

[5] Civil Code section 2332 reads as follows: "As against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other."

Corporations Code section 15009 reads as follows:

"(1) Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of

As for the liability of SPBI (the only entity that appellants acknowledge is "separate"), SPBI, as general partner of PBL, is charged with the knowledge of, and liable for the torts of, that entity (Corp. Code, §§ 15009, 15012, 15013); and PBL is liable for the torts because the knowledge of Alan I. Casden (its general partner) and Henry Casden (its attorney) are imputed to it.

K. *There is substantial evidence in the record to support the finding of tortious interference with contract by FCP, CMRI, MG and Alan I. Casden.*

 Appellants' argument that FCP, CMRI, MG, and Alan I. Casden cannot be held liable for tortious interference with contract because their activities were privileged is essentially the same argument made with respect to conspiracy to induce breach of contract, and it must be rejected for the same reasons. However, appellants' arguments are factually and legally unsupportable for several additional reasons. First, in order for appellants to even raise this claim of privilege at trial (which they did not do), appellants were required to have raised this defense as an affirmative defense in their answer to the first amended cross-complaint, which they also did not do. (*Mayes* v. *Sturdy Northern Sales, Inc.* (1979) 91 Cal.App.3d 69, 79 [154 Cal.Rptr. 43]; *Culcal Stylco, Inc.* v. *Vornado, Inc.* (1972) 26 Cal.App.3d 879, 881 [103 Cal.Rptr. 419].)

Second, appellants claim that FCP, CMRI, MG, and Alan I. Casden became parties to the agreements so that they cannot be held liable for

the fact that he has no such authority. For purposes of this subdivision, 'knowledge' includes constructive notice pursuant to Section 15010.7.

"(2) An act of a partner which is not apparently for carrying on of the business of the partnership in the usual way does not bind the partnership unless authorized by the other partners.

"(3) Unless authorized by the other partners or unless they have abandoned the business, one or more but less than all the partners have no authority to:

"(a) Assign the partnership property in trust for creditors or on the assignee's promise to pay the debts of the partnership.

"(b) Dispose of the goodwill of the business.

"(c) Do any other act which would make it impossible to carry on the ordinary business of a partnership.

"(d) Confess a judgment.

"(e) Submit a partnership claim or liability to arbitration or reference.

"(4) No act of a partner in contravention of a restriction on authority shall bind the partnership to persons having knowledge of the restriction."

Corporations Code section 15013 reads as follows: "Where, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership or with the authority of his copartners, loss or injury is caused to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefor to the same extent as the partner so acting or omitting to act."

inducing their own breaches is unmeritorious because appellants *did* plead as an affirmative defense in their verified answer to the first amended cross-complaint that FCP, CMRI, MG and Alan I. Casden had *no privity of contract with GHK*.

 Third, the privilege of a parent or subsidiary corporation to interfere with the contractual relationship of the other "is at most a qualified one dependent for its existence upon the circumstances of the case." (*Culcal Stylco, Inc.* v. *Vornado, Inc., supra,* 26 Cal.App.3d at p. 883.) A resolution of this issue turns on the parent or subsidiary's predominant purpose in inducing the breach of contract. (*Ibid.*) Thus, the question on the issue of privilege is a question for the trier of fact. (*Ibid.*; *Sade Shoe Co.* v. *Oschin & Snyder* (1984) 162 Cal.App.3d 1174, 1180 [209 Cal.Rptr. 124].) There is substantial evidence in the record to support the finding that FCP, CMRI, MG, and Alan I. Casden's purpose in inducing MDC and MGI to breach the agreements was not for a proper purpose that would bring them within the privilege.

Finally, appellants are incorrect that the trial court made no findings that the transfers of the Property in breach of the agreements proximately caused GHK any damages.

L. *There is substantial evidence in the record to support the judgment against Coast and MPBI.*

So-called "specially appearing" appellants Coast and MPBI claim that the judgment entered against them is not valid and enforceable because they were not served with process and/or did not appear in the action. This is wishful thinking, at best. CMRI, which appellants acknowledge was a wholly owned subsidiary of Coast, was sued as "Coast Savings and Loan Association dba Coast Mortgage & Realty Investors." Moreover, in 1984, Coast purchased 100 percent of the stock of MGI, and is therefore its successor in interest.

Further, after Coast was allegedly (according to appellants) dismissed from the action at the October 13, 1987, trial setting conference, appellants' counsel sought and obtained the disqualification of GHK's counsel in this action (just two weeks before the trial date) on the ground that an attorney at the law firm then representing GHK, Jeffer, Mangels & Butler, had represented *Coast* at a previous law firm in connection with the sale of the Property by FCP to MG. In fact, in appellants' motion papers to disqualify GHK's counsel, appellants refer to Coast as a cross-defendant in this action. Coast cannot claim that it has not appeared in this action when it

disqualified GHK's counsel on the grounds that an attorney at GHK's law firm previously represented Coast.

## V.

### DISPOSITION

The judgment is affirmed. Costs of appeal are awarded to respondent.

Lillie, P. J., and Johnson, J., concurred.

A petition for a rehearing was denied November 9, 1990, and appellants' petition for review by the Supreme Court was denied January 3, 1991.