Filed 4/21/23  De Anda v. Guillen CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JOSEPHINE DE ANDA,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>LISA GUILLEN,<br><br>        Defendant and Appellant. | B318392<br><br>(Los Angeles County<br>Super. Ct. No. BC680492) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jon R. Takasugi, Judge.  Affirmed.

Law Office of Lorrie A. Walton and Lorrie A. Walton for Defendant and Appellant.

Park & Lim, S. Young Lim, Dennis McPhillips and Jessie Y. Kim for Plaintiff and Respondent.

_____

Defendant Lisa Guillen appeals from a judgment finding her liable for financial elder abuse and other torts and breaches against her grandmother, plaintiff and respondent Josephine De Anda.

Guillen and De Anda agreed to live together in a house owned by De Anda, in exchange for Guillen paying to remodel the house and caring for De Anda as she aged. The trial court found Guillen deceived De Anda into believing De Anda had to grant Guillen a joint tenancy in the house to obtain a construction loan for the remodel. Guillen then misappropriated substantial portions of the construction loan to pay her personal expenses and debts and to support a failing restaurant business. By the time De Anda's children discovered what Guillen had done, the construction funds were gone, the loan was in default, and the remodel was incomplete.

The trial court noted that De Anda did not call an expert or otherwise provide evidence to establish the amount of her damages. The court nonetheless concluded the amount of the construction loan, $375,000, constituted an appropriate approximation of De Anda's damages, in addition to certain smaller amounts to which the parties stipulated relating to Guillen's other acts of malfeasance.

On appeal, Guillen argues the trial court's factual findings were insufficient to establish financial elder abuse, and further argues the damages award cannot stand in light of De Anda's failure to provide supporting evidence. We reject these challenges, and hold the evidence was sufficient to show financial elder abuse. Harm having been established, the trial court was entitled to approximate damages, particularly when Guillen's

2

own misconduct, including commingling funds and obfuscatory recordkeeping, impeded a precise calculation.

Accordingly, we affirm.

## BACKGROUND

De Anda, by and through Jo Anna De Anda, her guardian ad litem, and Melinda Wilson, successor trustee to De Anda's living trust, filed a complaint against Guillen and others, and twice amended it. Against Guillen, the second amended complaint asserted causes of action for financial elder abuse, quiet title, fraud through intentional misrepresentation, rescission, conspiracy to commit fraud, fraud through suppression of fact, conversion, breach of contract, accounting, common count, cancellation of instrument, and declaratory and injunctive relief.

Following a bench trial, the trial court issued a statement of decision. On appeal, Guillen largely does not challenge the trial court's factual findings, instead disputing that those findings support the trial court's legal conclusions. Accordingly, we deem it unnecessary to summarize the evidence presented at trial, and instead summarize the statement of decision in detail. To the extent evidence not included in the statement of decision is relevant to this appeal, we address it in our Discussion, *post*.

## 1. Findings of fact

In its statement of decision, the trial court found the following facts:

De Anda, born in 1931, is a widow who owned five or six properties "free and clear." Before the events underlying the instant litigation, she had $240,000 in cash in a credit union account. She "was quite self-sufficient," at times living on her

3

own and at other times living with "one or another of her five children."

Guillen is De Anda's granddaughter, and was employed as a bookkeeper. Guillen had lost a home to foreclosure and told De Anda she was being outbid whenever she tried to buy a new house. Guillen and De Anda then orally agreed to remodel and live together in one of De Anda's homes in Pasadena (the Pasadena home) that had sat vacant for many years. As part of the agreement, Guillen would care for De Anda as she aged. Also agreed was that Guillen "would pay for all the costs of the remodel, the bills and utilities." Guillen and De Anda also agreed that Guillen would be allowed to live in the home indefinitely, or that she would inherit the home entirely when De Anda died. To which of these options the parties specifically agreed was an issue of dispute at trial.

Guillen "persuaded" De Anda that De Anda would not be able to obtain a loan to finance the Pasadena home remodel unless De Anda "deed[ed] half the house to [Guillen] as joint tenants in common with the right of survivorship." Accordingly, De Anda executed a grant deed adding Guillen to the title in April 2013. A year later, Guillen applied for, and obtained a loan for approximately $375,000, with she and De Anda listed as co-borrowers.

The trial court noted evidence that De Anda could have obtained the loan without adding Guillen to the home's title, contrary to Guillen's assertions to De Anda. De Anda presented evidence at trial of four loans for which she qualified "without her having to forfeit half her equity in the property to [Guillen.]" De Anda's expert witness opined that deeding the property to Guillen in fact "made no economic sense." The court further

4

implied that De Anda was in a stronger economic position to obtain a loan than Guillen. In support of this conclusion, the trial court compared De Anda's ownership of multiple properties and hundreds of thousands of dollars in the bank to Guillen's foreclosure, multiple debts, a prior judgment against her, and virtually no cash or assets other than the joint tenancy she had persuaded De Anda to grant her. Although Guillen claimed she had assets of $192,000 from her deceased husband's life insurance payment, the court found the money "either never existed or was spent before the period of time involved in this matter," noting, inter alia, that it was not listed as an asset on the loan application.

Guillen called her own loan broker as an expert witness. Although the broker testified De Anda would not have qualified without Guillen's help, the court found his "conclusion and his overall testimony" to be "suspect," noting that the broker had admitted he had not explained to De Anda the legal effect of granting Guillen a joint tenancy, and the broker further stated he was not sure if he had worked on the actual loan. The court also noted Guillen's misrepresentations on the loan application, in which she omitted her foreclosure and claimed to be the full owner of the Pasadena home.

In any event, Guillen and De Anda obtained the loan and in May 2014, the lender issued a check made out to Guillen and De Anda for $358,920.55. Guillen "immediately obtained [De Anda's] signature and deposited [the check] into an individual account she opened just days earlier." Guillen "then went on a spending spree," using funds drawn from the account for "vacations to Las Vegas, Palm Springs, Lake Havasu, Temecula, Arizona, Hawaii, the Dominican Republic, and three

5

weeks in Italy." It is not clear whether there were funds in the account apart from the construction loan funds—at a minimum, Guillen commingled the loan funds with her other funds. Guillen also used the construction loan proceeds to pay off her personal debt and a prior judgment against her.

All or most of Guillen's vacations were taken between June and December 2014, a period in which regulators had " 'red-tagged' " the remodel waiting for Guillen to take further action. During this same time, Guillen used the loan proceeds to pay the monthly loan payments.

In addition to the remodel, Guillen "was intensely involved in saving a failing business with her mother-in-law." The business was called "Taco Factory." Guillen "cajoled" De Anda into loaning her $30,000 to help save Taco Factory. Guillen later "misallocate[ed] thousands more of [De Anda's] money" to support Taco Factory, which ultimately went bankrupt in March 2015.

The court found, "Without any accounting, [Guillen] commingled construction money, Taco Factory money, her personal funds, [and] personal and business loans." "Money was transferred between different bank and credit union accounts, and commingled amongst so many unrelated business interests and private spending, the transactions were not meant to be followed by anyone but the most sophisticated forensic accountant. Unfortunately, [De Anda] did not retain an expert [and thus] provid[es] little guidance as to damages. However, ballpark estimations and balances show that two-thirds of the [remodel] loan money had been spent before building permits had been pulled."

Without De Anda's knowledge, Guillen also borrowed $65,000 from Walt Marrs for Taco Factory, using the Pasadena home as collateral. Guillen executed a deed of trust on the Pasadena property to Marrs, on which Guillen forged De Anda's signature.

Guillen ultimately obtained the necessary permits and resumed the remodel. Rather than rehiring the original contractor, Guillen and her then-boyfriend, Jason Smith, an electrician without a contractor's license, took over the construction. At trial, Guillen testified Smith had given her receipts and a weekly accounting of construction expenditures, but Guillen had not kept them. At some point Guillen borrowed $56,000 from Smith to fund the remodel, and executed a deed of trust on the Pasadena home to Smith. The deed was signed by Guillen only, not De Anda.

The court surmised that Guillen's "end game was to borrow whatever money she could get to finish the remodeling so she could refinance the entire house to cover all the various loans and debt, [while] trying to avoid being discovered." The court found "substantial evidence" that Guillen kept her actions secret so her aunts and uncles, De Anda's children, would not know what she was doing.

In April 2016, De Anda's children discovered the Walt Marrs trust deed on which Guillen had forged De Anda's signature. They then checked De Anda's credit union account and discovered De Anda's ATM card was missing as was over $200,000. They further discovered that checks had been written out of De Anda's Chase bank account, which De Anda said were forgeries, including one for $26,000.

Confronted with these discoveries, Guillen refused to sign the Pasadena home back to De Anda. De Anda's children notified the police, who arrested Guillen. Guillen ultimately pleaded guilty to two counts arising from the forgery of the Marrs grant deed. The district attorney chose not to proceed on the allegations of the forged $26,000 check. The bank, however, reimbursed De Anda the $26,000.

Guillen never paid back the construction loan as she had agreed with De Anda. As noted, Guillen initially paid back the loan with the loan proceeds themselves, but later defaulted when she missed payments in February and March 2017. At the time of the trial court's decision, the remodel still was incomplete and De Anda and her children were making the loan payments. Guillen and Smith had moved out of the Pasadena home. De Anda had a stroke in 2018, and now suffers from dementia.

An architect testified that the $358,000 check from the construction loan lender could have been enough to complete the entire remodel, including a pool and fireplace that were never built. This estimate assumed "cheap" materials were used, and indeed the portion of the remodel that was complete used "cheap" materials. The architect estimated the remodel would take an additional $120,000 to complete.

## 2.    Conclusions of law

The trial court found De Anda had established financial elder abuse, because the evidence showed Guillen "wrongfully misappropriated her elderly Grandma's monies and interest in real property with an intent to fraudulently conceal that misappropriation and by exerting undue influence on Grandma." The court found Guillen was in material breach of her oral agreement with De Anda, in particular because Guillen "did not

8

pay for the remodel, and [De Anda] is forced to repay the loan for the construction."

The trial court also found Guillen liable for fraud, based on her forgery convictions and other evidence. The court concluded Guillen also had a fiduciary duty to De Anda "by way of promises of future care, seizure and distribution of her construction loan monies, and control over her bank and credit union accounts. [Citation.] As such, [Guillen] clearly owed a duty to disclose material facts concerning her commingling of monies and manipulation of the Pasadena house interests, and her failure to do so was done with the clear intent to defraud."

The trial court restored title in the Pasadena home to De Anda alone, and cancelled any deeds bearing Guillen's, Smith's, or Marrs's names.

As to the question of money damages, the trial court stated, "There is no doubt the construction added value to [De Anda's] Pasadena house." The court then explained the difficulties in determining that added value. The court rejected a "drive-by exterior-only appraisal" by an expert called by Guillen, because "there was no reliable baseline prior to the commencement of the project," and "[a]ll properties in the area have increased substantially in value." Further, the appraisal assumed the home was in a saleable condition, which it was not, and evidence at trial indicated completing the remodel would cost an additional $120,000. The court stated, "[Guillen] cannot prevail by leaving Grandma having to advance more money and complete more work."

Although Guillen offered her own accounting purportedly establishing she "ultimately deposited more money [towards the remodel] than she withdrew," the trial court stated it was

"unpersuaded by [Guillen's] ex post facto re-creative accounting and wild extrapolations about what she likely spent in cash on the construction." The court found Guillen not credible, noting she admitted commingling funds, she misappropriated construction money for other purposes, the timing of the expenditures did not correlate with the construction work, the balances in the accounts ran prematurely low relative to progress on the remodel, Guillen was convicted of forgery, and she "left no *audit trail* and to the contrary actively worked to prevent financial oversight."

The trial court noted that De Anda herself had "provided almost nothing" to calculate the amount of her damages. "Grandma has serious losses, but the Court is not in a position to take out a calculator, cull through thousands of pages, get receipts from third-party vendors, and make a spreadsheet."

"However," stated the trial court, "[M]aybe this is the wrong approach." Apparently implying that Guillen should not be able to offset De Anda's damages with the costs actually expended on construction, the court noted that if Guillen and Smith had themselves brought an action against De Anda to recover for the construction costs, as unlicensed contractors they would be ineligible to do so under Business and Professions Code section 7031.

The trial court acknowledged lawsuits by unlicensed contractors might be a "poor analogy." "[W]hat might be more compelling is Grandma did not want any debt, and now she is responsible for repayment of the $375,000 construction loan, more than $90,000 of [which] was misappropriated to Taco Factory. But for [Guillen's] malfeasance, Grandma would not have this debt that [Guillen] agreed to cover but is not and

cannot." The court continued, "What is the cost to Grandma, age 90, to be encumbered with debt she never wanted in the first place? While Grandma struggled through her testimony, she made it very clear she did not want to have to pay any money." Accordingly, the court awarded De Anda $375,000 plus bank-charged interest.

The trial court awarded additional monetary damages based on stipulations by the parties: $30,000 for the loan De Anda had given Guillen for Taco Factory, and $13,000 for money Guillen withdrew from De Anda's credit union account without permission. The total award therefore was $418,000, plus interest of $218,250.

The trial court entered judgment consistent with its statement of decision, and Guillen timely appealed.

## STANDARD OF REVIEW

"In reviewing a judgment based upon a statement of decision following a bench trial, we review questions of law de novo. [Citation.] We apply a substantial evidence standard of review to the trial court's findings of fact. [Citation.] Under this deferential standard of review, findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings." (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.) "It is not our role as a reviewing court to reweigh the evidence or to assess witness credibility." (*Ibid*.)

11

## DISCUSSION

### A. The Finding of Financial Elder Abuse Is Supported By Substantial Evidence

Guillen's first contention on appeal is that substantial evidence does not support the trial court's finding of financial elder abuse.[1]

Financial abuse of an elder occurs when a person or entity "[t]akes, secretes, appropriates, or retains" the "real or personal property of an elder" "for a wrongful use or with intent to defraud, or both," or "by undue influence." (Welf. & Inst. Code, § 15610.30, subds. (a)(1), (3).) An "elder" is a person 65 years or older. (*Id.*, § 15610.27.)

The evidence cited in the statement of decision indicates that Guillen deceived De Anda into granting Guillen a joint tenancy in the Pasadena home by convincing De Anda, falsely, that this grant was necessary to secure a construction loan. Guillen then encumbered that property with a $375,000 loan, some of which the trial court found Guillen misappropriated, using it for her own personal expenses and debts or to aid her failing restaurant business. Guillen also used De Anda's ATM card to withdraw funds from De Anda's credit union account without De Anda's permission. These findings are sufficient to establish the Guillen took or appropriated De Anda's property for

---

[1] Guillen does not challenge the findings that she also was liable for fraud and breach of contract.

wrongful use and with intent to defraud, thus establishing financial elder abuse.[2]

Guillen argues statements in the introduction of the trial court's statement of decision, entitled "Overview," undercut the trial court's conclusion that Guillen appropriated De Anda's property in bad faith.

Guillen notes the following sentence from the introduction to the statement of decision: "What may have started quite innocently as using one account to pay expenses for another, with the idea that everything would work out in the end and nobody would ever know or care, ended in hundreds of thousands of dollars missing and misappropriated with friends and family suffering the losses." Guillen argues this amounts to a finding that her conduct in obtaining the joint tenancy and the construction loan was innocent, as opposed to wrongful or with an intent to defraud.

Also in the introduction, the trial court wrote, "As is often the case, Guillen did not sneak away with the hundreds of thousands of dollars that grandma and other friends are missing, but through gross mismanagement and poor business decisions, the money has likely been squandered." Guillen argues this finding "is more akin to a finding of negligence," and precludes "a finding that the taking was for a wrongful use or with the intent to defraud or by undue influence."

Guillen's interpretation of these introductory statements overlooks the rest of the statement of decision, which makes clear the trial court's conclusion that Guillen deliberately

_____

[2] Because either intent to defraud or wrongful use is sufficient to establish financial elder abuse, we need not address whether there was substantial evidence of undue influence.

13

misappropriated De Anda's property for her own personal use, which would be "for a wrongful use" by itself. (Welf. & Inst. Code, § 15610.30, subd. (a)(1).) The trial court's remarks quoted by Guillen may have given her the benefit of the doubt that she intended, at least initially, to restore the funds she misappropriated so that no harm was done and none were the wiser. That does not obviate the fact that she misappropriated the funds and never returned them. If you deceive someone into giving you funds, or take the funds without permission, it is no excuse that you eventually intended to return the money, nor does it matter that the reason you cannot return the money is because of poor financial decisions as opposed to malice. The misappropriation is still "for a wrongful use" and therefore constitutes financial elder abuse. (*Ibid.*) Guillen cites no authority to the contrary.

Guillen relies on another sentence in the statement of decision in which the trial court stated that the construction loan was "highly controversial and is financial elder abuse in and of itself." Guillen argues the taking out of the loan by itself "does not establish every element of 'Financial Elder Abuse.' " Other than this conclusory statement, Guillen does not explain why the quoted sentence was in error. In any event, in the text following that sentence, the trial court explains that its reference to the taking out of the loan included Guillen convincing De Anda to grant Guillen a joint tenancy in order to obtain that loan, which as we have explained supports a finding of financial elder abuse.

Guillen argues the evidence that she was included as a co-borrower on the loan with De Anda and promised De Anda she would repay the loan, and that she, in fact, made some payments on the loan, negate any possible finding of bad faith. She notes

14

the trial court concluded her "end game" was to finish the remodel so she could refinance and pay off all outstanding debts before she was discovered, which Guillen claims also establishes she was acting in good faith. Again, that Guillen may have intended to pay back the money eventually does not change the fact that she misappropriated it in the first place. Adding herself as co-borrower, promising to pay off the loan, and paying off some of the loan does not as a matter of law establish good faith—a fair contrary inference is that she was doing this to persuade De Anda to grant her the joint tenancy, and to cover up her misappropriation. Guillen misconceives our standard of review in ignoring these fair inferences.

Guillen argues the following purported testimony establishes there was no trickery on her part: (1) it was De Anda's idea that Guillen and she move in together; (2) De Anda, as owner of five properties, was "well versed in real property law" such that she would understand the consequences of a joint tenancy; and (3) De Anda had a similar joint tenancy arrangement with one of her sons. These arguments again misunderstand the standard of review. So long as there is sufficient evidence to support the judgment, we "defer[ ] to the trier of fact's determinations as to the credibility and weight of the evidence," and "disregard evidence contrary to the judgment." (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582.)

We note, even assuming arguendo the joint tenancy initially was proper—that is, Guillen and De Anda entered into it in good faith with eyes wide open—there is no dispute De Anda agreed to the joint tenancy in exchange for a promise that Guillen would pay for the remodel herself and would care for De Anda. The trial court found Guillen breached that agreement by

15

squandering the construction loan funds, defaulting on the loan, and moving out of the house. Guillen does not dispute the trial court's finding of breach of contract, nor does she challenge the voiding of the joint tenancy on that basis.

We further note, even if Guillen obtained the joint tenancy properly, the evidence that Guillen misappropriated the construction loan would itself supply sufficient evidence of financial elder abuse.[3]

## B. The Award of Damages Was Proper

Guillen contends De Anda failed to establish she was harmed by Guillen's alleged malfeasance, thus precluding an award of damages.

The damages award had three components, not including interest or attorney fees: $375,000 for the construction loan Guillen failed to repay, $30,000 for the Taco Factory loan, and $13,000 for money Guillen took from De Anda's credit union account. Although on appeal, Guillen argues she repaid some of the Taco Factory loan, and moved money from the credit union account with De Anda's permission, she does not address or contest the trial court's finding that the parties had stipulated to those two items of damages. We therefore do not discuss those two damages items further.

As to the $375,000 for the construction loan, the crux of Guillen's argument is that at least some of that loan was spent on

---

[3] Guillen argues reversal of the financial elder abuse finding also requires reversal of any attorney fees award. There is no attorney fees award in the record; the judgment recited that award was yet to be determined. Regardless, because we do not reverse the elder abuse finding, Guillen's argument fails.

the remodel, thus increasing the value of the Pasadena home. Guillen notes, as did the trial court, that De Anda did not provide a forensic accounting or other evidence to establish how much of the construction loan funds were misappropriated, or to show that De Anda's losses exceeded her gains. Thus, claims Guillen, in setting damages the trial court "had to rely on rank speculation." (Boldface & italics omitted.)

To the extent Guillen suggests De Anda had to provide an exact accounting to establish damages, this is unsupported by the case law. " 'Where the *fact* of damages is certain, the amount of damages need not be calculated with absolute certainty. [Citations.] The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation.' [Citations.]" (*Tufeld Corp. v. Beverly Hills Gateway, L.P.* (2022) 86 Cal.App.5th 12, 32.) "This is especially true where, as here, it is the wrongful acts of the defendant that have created the difficulty in proving the amount of loss . . . ." (*GHK Associates v. Mayer Group, Inc.* (1990) 224 Cal.App.3d 856, 874 (*GHK Associates*).)

Here, the fact of damages is certain. Guillen argues the value she added to the Pasadena home through the remodel exceeds any losses De Anda suffered, or at the very least De Anda did not prove to the contrary. Guillen does not dispute, however, the trial court's finding that De Anda is now saddled with the construction loan, which Guillen failed to pay off as promised. Further, the remodel is incomplete and requires De Anda to expend an additional $120,000 to finish. We agree with the trial court when it stated, "[Guillen] cannot prevail by leaving

Grandma having to advance more money and complete more work."

Accordingly, the trial court was entitled to approximate the damages, and the amount of the construction loan was a reasonable basis to compute an award. This is particularly so when, as the trial court found, Guillen's commingling funds and obfuscatory recordkeeping "created the difficulty in proving the amount of loss." (*GHK Associates*, *supra*, 224 Cal.App.3d at p. 874.)

Guillen argues although she commingled construction funds with other funds, De Anda provided no evidence as to what money was spent on construction as opposed to other expenditures, thus failing to prove that Guillen misappropriated more money than she contributed to the remodel. The evidence showed, however, that Guillen had spent two-thirds of the loan funds before pulling any permits, which is strong circumstantial evidence that she was spending the funds on something other than the remodel. Guillen argues the remodel costs were more expensive than anticipated, but contrary evidence from the testifying architect established that the entire remodel could have been accomplished with the $358,000 obtained from the construction lender, including remodel features that never were completed.

Guillen contends she herself provided an adequate accounting of expenditures. The trial court rejected her accounting as not credible, a finding we cannot disturb on appeal. (*Cornerstone Realty Advisors, LLC v. Summit Healthcare REIT, Inc.* (2020) 56 Cal.App.5th 771, 804–805 ["[W]itness credibility is a matter within the exclusive province of the trial court, not us."].) Guillen argues the trial court "shockingly refused to take

18

the time to review [the] evidence that supported [Guillen's] claim that the monies she obtained from the loan in fact went into the remodel of the house." Apart from stating it would not engage in a detailed forensic analysis to calculate De Anda's damages, there is no indication the trial court did not consider Guillen's evidence.

Guillen cites marriage dissolution cases for the requirement of adequate recordkeeping and record tracing when commingled funds are at issue, and suggests that requirement applies to the commingled funds in the instant case. The cited cases involved determinations whether portions of commingled funds were separate as opposed to community property for purposes of distributing assets upon divorce where the law imposes a tracing requirement. (*See v. See* (1966) 64 Cal.2d 778, 784; *In re Marriage of Ficke* (2013) 217 Cal.App.4th 10, 25; *In re Marriage of Stoll* (1998) 63 Cal.App.4th 837, 841.) The cases have no application here, where the issue is not community versus separate property in a family law action, but damages in a tort action. Guillen cites no authority applying a recordkeeping or tracing requirement in the latter context.

Guillen also cites cases in which parties utilized forensic accountants, in arguing, "The law is clear—an accounting or tracing of commingled funds is mandated under cases such as this." Apart from citing the cases and indicating, briefly, how forensic accountants were used in each (e.g., to trace commingled funds), Guillen identifies nowhere in the cases in which the courts held that forensic accounting was "mandated" such that a court could not assess damages without it. Such a rule, moreover, would place the burden on De Anda to untangle the web of Guillen's commingling and recordkeeping, which would contravene the principle that a court is entitled to approximate

19

damages, particularly when the defendant's own conduct renders a precise calculation impracticable. (*GHK Associates, supra*, 224 Cal.App.3d at p. 874.)

## DISPOSITION

The judgment is affirmed. Respondent Josephine De Anda is awarded her costs on appeal.

<u>NOT TO BE PUBLISHED.</u>

BENDIX, Acting P. J.

We concur:

CHANEY, J.

WEINGART, J.