Filed 9/5/23  Wong v. Wong CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| CHIK PUI WONG et al., | B314931 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BC655122) |
| v. | |
| YIM POOI WONG et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael L. Stern, Judge.  Affirmed as modified.

Murtaugh Treglia Stern & Deily, Robert T. Lemen, and Devin E. Murtaugh for Defendants and Appellants.

Grignon Law Firm, Margaret M. Grignon, and Anne M. Grignon; Cracolice & Associates and James R. Cracolice for Plaintiffs and Respondents.

_____

Defendants appeal from a judgment entered after a court trial in which the trial court awarded plaintiffs $2,522,515 in compensatory damages and $5,045,030 in punitive damages plus prejudgment interest and costs.

The individual defendants and plaintiffs, who are family members, co-owed seven apartment buildings that defendants (the individuals and their companies) managed. For at least a decade, defendants embezzled profits from the apartment buildings. On appeal, defendants do not challenge the trial court's liability determinations, including that defendants committed fraud and breached their fiduciary duties to plaintiffs. Defendants concede plaintiffs are entitled to an award of both compensatory and punitive damages based on the wrongdoing.

Defendants (the individuals) challenge the amount of the awards. As to compensatory damages, they contend plaintiffs' lost profits calculation is too speculative to support the award. As to punitive damages, they contend the award is excessive and not supported by substantial evidence of their ability to pay "without being financially destroyed." The judgment also includes a permanent injunction enjoining defendants (the individuals and their companies) from managing, maintaining, or caring for the co-owned apartment buildings. Defendants challenge the injunction as overbroad.

For the reasons explained below, we agree with defendants that the punitive damages award is excessive as a matter of law, and we reduce the award accordingly. In all other respects, we reject defendants' contentions and affirm the judgment as modified.

2

# BACKGROUND

## I. The Parties

Defendant Yim Pooi Wong (Jimmy Wong) is the elder brother of plaintiff Chik Pui Wong (Chris Wong). There is a 10-year age difference between the two. Chris Wong went to medical school and earned a Doctor of Medicine (M.D.) degree. At the time of trial, he worked as a hospital consultant in areas such as workflow and software installation. His wife, Biyu Liao (Mary Wong), earned a master's degree in business taxation and owned a company where she worked as a certified public accountant. Chris and Mary Wong (collectively, plaintiffs) lived in the San Francisco area.

Defendant Jimmy Wong and his wife Lai Hung Wong (Polly Wong) lived in the Los Angeles area and worked full time managing real estate properties in which one or both of them had an ownership interest. In 2010, Jimmy Wong formed defendant Productive Maintenance, LLC (Productive). He represented that he and his son Derek Wong performed repairs and maintenance work on various properties through Productive, including the properties at issue in this action. Polly Wong is a licensed real estate broker. In 2011, she formed and became sole owner of defendant Premier Investors Real Estate, Inc. (Premier), a property management and real estate brokerage firm that managed various properties, including the properties at issue here. Productive and Premier used the same business address.[1]

---

[1] Defendants Productive and Premier are not liable for the compensatory or punitive damages awards. As explained more fully below, they are enjoined under the permanent injunction from managing, maintaining, or caring for the co-owned

3

## II. The Jointly Owned Properties and Management of Same

Between 2000 and 2006, Jimmy Wong and Chris Wong acquired ownership interests in seven apartment buildings in Los Angeles County, comprising a total of 120 rental units, and ranging from 10 to 28 units each (collectively, the Properties). They each owned a 50 percent interest in four of the apartment buildings, referred to in this action as Andrita, Hellman, Pomelo, and 5th Street. Regarding the apartment building referred to as Cogswell, Chris and Mary Wong owned a one-third interest, Jimmy and Polly Wong owned a one-third interest, and unrelated third parties owned a one-third interest. With respect to the apartment building referred to as Hazelhurst, Chris and Mary Wong owned a 31.5 percent interest, Jimmy and Polly Wong owned a 42 percent interest, and an unrelated third party owned a 26.5 percent interest. Finally, regarding the apartment building referred to as Willis, Chris Wong owned a two-sevenths interest and Jimmy and Polly Wong owned a five-sevenths interest.

Jimmy and Polly Wong assumed responsibility for managing and maintaining the Properties, at first as individuals, and then through Premier (Polly Wong's property management company formed in 2011) and Productive (the entity that purportedly repaired and maintained the Properties beginning in 2010). There were no written operating or management agreements between the parties. Productive, which was not

properties that are the subject of this action. Defendants Jimmy and Polly Wong are jointly and severally liable for the compensatory and punitive damages awards, and they are also bound by the injunction.

licensed as a contractor between 2010 and 2016, received more than $1.1 million in payments from the Properties' bank accounts. Premier received more than $380,000 in management fees, paid from the Properties' bank accounts. Over the years, Premier sometimes charged the Properties a percentage of rents (e.g., seven percent) as its management fee and sometimes it charged a flat rate.

Each year, Polly Wong/Premier sent Chris and Mary Wong operating statements that purported to show the Properties' gross income (from rent, laundry), itemized operating expenses (e.g., payments to Productive and Premier), and net income. Plaintiffs and defendants used the data in these operating statements to prepare their tax returns.

In 2013, defendants sent plaintiffs $18,075, as their share of profits from the Properties. In 2014, plaintiffs received $20,700.21 in profits, and in 2015 they received $16,849. Plaintiffs did not receive any payments of profits for 2007 through 2012 or from 2016 forward.

## III. Plaintiffs' Partition Actions and Discovery of Defendants' Embezzlement Scheme

In late 2016, plaintiffs believed the co-owned Properties were not profitable, based on the data reflected in the operating statements they received from defendants. Therefore, plaintiffs decided to sell their interests in the Properties. They were unable to reach an agreement with Jimmy Wong regarding his purchase of their interests. Thus, in March and April 2017, Chris Wong filed a separate partition action for each of the seven co-owned Properties, and Mary Wong joined him as a plaintiff in the partition actions related to the two properties she co-owns.

5

Jimmy Wong filed cross-complaints in the partition actions, and the trial court consolidated the seven cases.

In order to conduct an appraisal of the Properties for purposes of the partition actions, Chris Wong requested a rent roll from defendants, which would show the amount of rent collected from the tenants in each of the 120 apartments. Over the years, plaintiffs did not receive rent rolls, only the operating statements from Polly Wong/Premier. Beginning in 2015, Plaintiffs had online access to review the bank accounts for the co-owned Properties. In response to the request for a rent roll, plaintiffs received a December 2016 rent roll. When they compared it to the operating statement and bank deposits for December 2016, they noticed that Premier collected significantly more in rent than was reflected on the operating statement and deposited into the Properties' bank accounts. When plaintiffs later reviewed additional accounting records from various years provided by defendants, and compared those records to the operating statements received from defendants and the online banking records, plaintiffs observed the same pattern: Defendants consistently underreported the rents collected on the operating statements, and deposited less money in the Properties' bank accounts than they collected in rental payments.

In late April 2017, plaintiffs served a subpoena for the production of the Properties' accounting and banking records on Jason Wong, the son of the individual defendants and Premier's accountant. Shortly thereafter, Jason Wong altered a November 2016 cash flow report for the co-owned Properties to reflect a much higher amount in total operating income (more than double) to account for defendants' previous underreporting of rent collected. Also in April 2017, defendants deposited more money

6

in the Properties' bank accounts than the amount they collected that month.

In June 2017, Jason Wong formed a repair and maintenance company called Rustic Craftsman Corp., which used the same business address as defendants Productive and Premier. As discussed more fully below, Rustic Craftsman, like Productive and Premier, was paid out of the Properties' bank account for work purportedly performed for the Properties.

## IV.    Plaintiffs' First Amended Complaints

In July 2017, plaintiffs filed first amended complaints in the seven consolidated actions, asserting causes of action for (1) partition; (2) an accounting; (3) conversion; (4) unjust enrichment by means of theft and embezzlement; (5) money had and received; (6) fraud and deceit; (7) violation of Business and Professions Code section 17200 by theft, embezzlement, and fraud; (8) breach of fiduciary duty; (9) recovery of compensation paid to unlicensed contractor (Productive); (10) declaratory relief regarding plaintiffs' rights and defendants' duties; (11) injunctive relief and request for an independent professional property manager for the Properties; and (12) negligence. Jimmy Wong and Polly Wong, as co-owners of the respective properties, were named in the first cause of action for partition and the second cause of action for an accounting. Jimmy Wong, Polly Wong, and Premier were named as the defendants in all other causes of action, except the ninth cause of action for recovery of compensation paid to an unlicensed contractor which was asserted against Productive only, and the twelfth cause of action for negligence which was asserted against Premier only. Productive was also named as a defendant in the tenth cause of action for declaratory relief and the eleventh cause of action for injunctive relief.

7

Jimmy Wong filed a first amended cross-complaint against plaintiffs. Because the cross-action is not at issue in this appeal, we need not address it further here.

During discovery, defendants produced complete rent rolls and bank records for the years 2014 to 2018, but they did not produce complete financial records for the years 2007 through 2013. Among the documents produced by defendants in discovery, plaintiffs found spreadsheets listing the "actual rents" for years 2013 through 2015 that defendants sent to their accountant so the accountant could amend defendants' tax returns. Although defendants knew plaintiffs had used the false data in the operating statements from Polly Wong/Premier to prepare their tax returns, defendants did not advise plaintiffs to amend their tax returns to accurately report income generated by the Properties.

Plaintiffs learned during discovery and through a forensic audit that the Properties were profitable, contrary to the false data in the operating statements they received from defendants. After deciding they no longer wanted to sell their interests in the Properties, plaintiffs dismissed their partition causes of action. They also dismissed their causes of action for an accounting and negligence.

## V. Phase 1 of Court Trial – Liability and Compensatory Damages

The court trial was held in two phases. Phase 1 regarding liability and compensatory damages commenced on December 16, 2019, and the presentation of evidence concluded on December 18, 2019. The following witnesses testified in plaintiffs' case-in-chief, in the following order: accounting expert Frank Wisehart; plaintiff Mary Wong; plaintiff Chris Wong; defendant Polly Wong;

Jason Wong; Derek Wong; and defendant Jimmy Wong.[2] Defendants called one witness: their accounting expert, Stacy Kinsel, and they cross-examined the other witnesses.

### A. Testimony regarding the embezzlement scheme

Jason Wong, the son of the individual defendants and Premier's accountant, testified at trial regarding defendants' embezzlement of rental payments from the co-owned Properties. The employee at Premier who received the rental payments would enter the amount paid by each tenant into an excel spreadsheet that became the rent rolls. Another employee would deposit the rental payments that were made by checks and money orders into the Properties' bank accounts and turn over to Polly Wong the rental payments made in cash. Polly Wong would place the cash in a safe in her office. She testified at trial that she typically gave Jimmy Wong more than half of this cash "to purchase stuff," and there was no accounting of these purchases. She also used some of the cash herself. The operating statements that Polly Wong/Premier sent to plaintiffs underreported the Properties' rental income by excluding the cash rental payments.

### B. Testimony of plaintiffs' accounting expert

Plaintiffs retained Frank Wisehart, a certified public accountant, certified fraud examiner, and master analyst in financial forensics, to conduct a forensic audit of the Properties and calculate the amounts defendants owed plaintiffs.

Wisehart reviewed the rent rolls and bank records for the Properties for 2014 through 2018, the years for which defendants produced complete records. For 2014, Wisehart found that

---

[2] The individual defendants and their sons, Jason and Derek Wong, testified as adverse witnesses in plaintiffs' case.

9

$168,748 in cash rental payments were not deposited into the Properties' bank accounts; for 2015, the amount of cash not deposited was $188,010; for 2016, the amount was $217,000; and in 2017, $11,372 in cash was not deposited. As set forth above, plaintiffs filed the first of the partition actions in March 2017. Thereafter, defendants deposited the cash rental payments into the Properties' bank accounts.

Wisehart also reviewed outflows from the Properties' bank accounts for 2014 through 2018, as reflected in the Properties' bank records. He separated the payments made from the bank accounts into four categories: general expenses that he found to be reasonable and whose legitimacy he did not question; payments to Productive; payments to defendants; and "other nonexpenses."

Wisehart audited payments made to Productive from the Properties' bank accounts. He found no evidence that Productive actually performed any of the maintenance or repair work for which it purportedly was paid. In response to plaintiffs' document requests, defendants produced handwritten invoices from Productive, but no accounting records supporting the invoices, such as receipts for materials purchased or payroll records (e.g., timecards) reflecting labor. Wisehart also found anomalies in the pattern of the payments to Productive. For example, on Christmas Eve in 2015, Derek Wong wrote nine checks to Productive, totaling $41,760. Between 2014 and 2018, Productive received more than $580,000 in payments from the Properties' bank accounts. Wisehart concluded the money paid to Productive—which was owned by Jimmy Wong and later his son Derek Wong—was misappropriated, and he declined to treat

those payments as expenses.  Disallowing the expenses increased the Properties' profits.

Wisehart also declined to treat payments to Rustic Craftsman ($185,952 in 2017 and 2018) and King Leung ($45,000) as proper expenses of the Properties.  As set forth above, Jason Wong formed Rustic Craftsman after plaintiffs filed the partition actions.  Wisehart found no evidence Rustic Canyon actually performed any work for which it was paid because defendants did not produce underlying documentation.[3]  King Leung, an unlicensed contractor, was Derek Wong's business partner, and defendants produced no documentation evidencing work performed by King Leung.  Wisehart did treat as reasonable and legitimate expenses payments to unrelated parties for maintenance on the Properties.

Wisehart also declined to treat the payments to Premier (Polly Wong's property management company) as expenses of the Properties because defendants did not produce underlying documentation supporting the management fees in response to plaintiffs' document requests.  Wisehart noted in his testimony that when defendants filed amended tax returns for 2013 through 2015, they did not deduct from the revised income figures as expenses any management fees paid to Premier.

Wisehart testified about other outflows from the Properties' bank accounts that he disallowed as reasonable expenses.  On June 30, 2015, for example, Polly Wong wrote four checks from the Properties' bank accounts, totaling $40,000 and made payable

---

[3]  Jason and Derek Wong testified at trial that Rustic Craftsman did not perform any repair or maintenance work itself; rather, it did billing for Productive.

11

to Century West BMW, for the purchase of a vehicle. Between 2014 and 2016, Jimmy and Polly Wong made payments to themselves and their LLC from the Properties' bank accounts totaling $181,000. Polly Wong also paid the mortgage and taxes on a different property (where her mother-in-law lived) out of the Properties' bank accounts.

For 2014 through 2018, Wisehart calculated the Properties' net profits, and plaintiffs' proportional share, based on the rent rolls and his determination of reasonable expenses documented by the records defendants produced. For 2007 through 2013, defendants did not produce adequate financial records for Wisehart to conduct a forensic audit of the Properties. Thus, to calculate 2013 net profits, Wisehart used 2014 figures and deflated the rental income and expenses based on applicable consumer price indices. Then, he subtracted the debt service (which he found held constant for all years). For 2012, he used his 2013 figures and deflated the rental income and expenses in the same manner. And so on, back to 2007. For 2019, another year for which he did not have adequate financial records, he calculated net profits through October by using 2018 monthly averages for rental income and expenses.

Wisehart testified that defendants owed plaintiffs $4,801,027: plaintiffs' collective proportional share of the Properties' net profits from 2007 through 2019 in the amount of $2,747,332; prejudgment interest on that amount, or $1,463,831;

and $589,864 in projected tax penalties plaintiffs would incur when filing amended tax returns.[4]

### C. Statement of decision and partial judgment

The parties submitted written closing arguments in February 2020.  After taking the matter under submission and receiving objections to the proposed statement of decision, on June 22, 2020, the trial court issued a 24-page statement of decision and partial judgment.

In the statement of decision, the court detailed defendants' embezzlement scheme, as summarized above.  For years 2014 through 2016, the court found defendants embezzled more than $754,000 in cash rental payments that were not deposited as well as withdrawals from the Properties' bank accounts.  The court found that during the same period, defendants only paid plaintiffs $37,549 as their share of the profits.

The trial court concluded plaintiffs met their burden on all causes of action in the operative complaint.  The court found plaintiffs were entitled to an award of $2,522,515 in compensatory damages on their causes of action for conversion, unjust enrichment, fraud and deceit, and breach of fiduciary duty.  The court stated these causes of action "overlap with the damages and relief requested in the remaining causes of action," so the court did "not consider that it is necessary to rule

---

[4] Using spreadsheets prepared by defendants' accountants in 2019, defendants' expert testified that defendants owed plaintiffs a total of $487,592.  In their appellate briefing, defendants do not discuss their expert's methodology or conclusions.  The trial court found their expert's conclusions were unreliable, and defendants do not challenge this finding on appeal.

13

separately on liability and damages on those overlapping causes of action." The court did not explain how it calculated the $2,522,515 compensatory damages award.[5] The court noted Wisehart calculated plaintiffs' compensatory damages as $4,801.027, and the court did not reject Wisehart's methodology or any of his figures.

The trial court found Wisehart "provided a thorough and reliable analysis of the damages incurred by [p]laintiffs due to [d]efendants' embezzlement and fraud scheme," including his extrapolation methodology for years 2007 through 2013 and 2019. The court also concluded Wisehart's "analysis of the outflow from the property bank accounts was proper." In support of this conclusion, the court found payments to Productive were not "verifiable expenses," as the "lack of supporting documentation" indicated either Productive "did not actually perform the work" or Productive "grossly inflated its billings, which it did not want exposed." The court found payments to Rustic Craftsman were not "proper expenses," as "Rustic Craftsman had every appearance of a sham entity used to funnel money from the [Properties' bank] accounts to Jason Wong . . . ." The court did not find credible Jason Wong's testimony that Rustic Craftsman was a " 'billing agency' " for Productive. The court noted that

---

[5] Defendants objected to the proposed statement of decision on the ground, among others, that it provided "no explanation of how the $2.5 million award was calculated, including what it represents or what years are encompassed by such amount." The court issued the statement of decision with no further explanation of its calculation. Defendants do not contend on appeal, however, that the matter must be reversed because the statement of decision was inadequate.

14

Rustic Craftsman was paid $185,952 in 2017 and 2018, and during that same period, Productive submitted its own "direct billings of $197,176." Moreover, Productive did not produce any documents showing it performed work for which Rustic Craftsman billed. Regarding King Leung, the court found the $45,000 in payments to him were not "verifiable expenses," given he was Derek Wong's business partner, he had no contractor's license, and "no documentation showed he performed work." The court also concluded "payments to Premier should not be treated as proper expenses" because Premier, a fiduciary, participated in the embezzlement and fraud scheme, so the management "fees paid to Premier should be disgorged."

The trial court granted plaintiffs' "request for declaratory and injunctive relief for the removal of Premier, Productive [], and all persons associated with them, at any time from managing, maintaining or caring for the subject properties." The court also concluded plaintiffs are entitled to punitive damages because they proved by clear and convincing evidence that defendants committed fraudulent acts.[6]

## VI.  Phase 2 of Court Trial – Punitive Damages

The punitive damages trial, or Phase 2, commenced on April 20, 2021, delayed due to the COVID-19 pandemic, and the presentation of evidence concluded on April 30, 2021. Much of the evidence of defendants' financial condition was undisputed. The parties stipulated to the fair market value of 16 of the 19 properties the individual defendants or their LLC owned in whole

---

[6] The trial court found Jimmy Wong was not entitled to any relief on his operative cross-complaint. As stated above, the cross-action is not at issue in this appeal.

or in part; their ownership interests in the 19 properties; their share of the real estate debt on the properties they owned in whole or in part; the valuation of Premier; and data from the individual defendants' tax returns for 2018 and 2019. The parties presented evidence that defendants' liquid assets were between $6.5 and $6.8 million. Plaintiffs did not dispute defendants' evidence indicating defendants' average annual net income was $578,150.

## A. Other evidence presented in plaintiffs' case-in-chief

Wisehart again testified as an expert for plaintiffs. In addition to his qualifications listed above, he stated that he is accredited in business valuation and is a certified valuation analyst. Plaintiffs retained him to determine, among other things, the individual defendants' net worth. He opined that Jimmy Wong's and Polly Wong's collective net worth as of October 31, 2020 was $37,969,426. Wisehart testified that he calculated net worth using Generally Accepted Accounting Principles and National Association of Certified Valuation Principles.

Regarding the value of defendants' real property, Wisehart relied on the parties' stipulation regarding the value of defendants' interests in the 16 properties, and the report from plaintiffs' real estate appraiser (Laurence Sommer) regarding the valuation of defendants' interests in the other three properties for which there was no stipulation. In his net worth analysis, Wisehart did not include costs of liquidating assets, and he did not discount the value of defendants' property interests as to properties in which they owned a partial interest (based on a

16

possible lack of marketability or control because of the fractional interest).

Plaintiffs' expert real estate appraiser, Laurence Sommer, testified regarding his opinions on the valuation of the three properties in which defendants owned an interest and there was no stipulation regarding valuation. Sommer also testified that the fractional discount analysis of Stephen Smith, defendants' real estate appraiser, as reflected in Smith's November 2020 report, was unsupported because, among other things, Smith cited general factors for application of a fractional interest discount that are not specific to the subject properties. Sommer stated that Smith did not compare the subject properties to the purported comparables on which he based his fractional discount claim. Sommer pointed out (as did plaintiffs' counsel) that Smith indicated in his November 2020 report that a comparative financial analysis of the purported comparables would be set forth in an attached exhibit, but the exhibit was not attached to the report. Sommer opined that nothing in Smith's November 2020 report supported applying a fractional interest discount in this case. In his career, Sommer had analyzed fractional discount claims on a few hundred occasions. In this case, he did not conduct a fractional discount appraisal for the subject properties.

**B.    Defendants' evidence**

Stephen Smith, defendants' expert real estate appraiser, testified regarding his discounted valuation of the properties in which defendants owned a fractional interest based on a lack of marketability and control of the interests.

By way of background, Smith prepared two different reports on his fractional discount analysis. In his first report,

17

dated November 2020, he discounted defendants' fractional interests by 19 percent using a sales comparison approach. This was the report that plaintiffs' expert Sommer reviewed and critiqued, as discussed above. Smith prepared a second report, dated March 2021, after plaintiffs took his deposition and a few weeks before the Phase 2 trial. In the latter report, he relied on an article he had recently discovered by Dennis Webb, titled "Using the Income Approach for Minority Interests," published a few years before the Phase 2 trial (the Webb method). Applying this methodology, Smith significantly increased his original discount to the valuation of each property in which defendants owned a partial interest, ranging from a discount of 32.5 percent to a discount of 46 percent.

In his trial testimony, Smith described the Webb method and his application of it as follows: "Mr. Webb takes into consideration a lot of factors of each of the propert[ies] in question. We look at the net asset value, we look at the mortgage, we look at the return on the investment, the cash flow, the yield rate and in doing kind of a discounted cash flow, so hypothetical over a 10-year period on all of these we ultimately come up with a discount for lack of control that is specific to each of the properties." Smith acknowledged that the income approach for determining a discount for lack of control "is relatively new in my industry." He explained that "there is not a database that exists for sales of private partnerships," so he looked to the "public securities market" where "lack of control is pretty much mirrored," in his opinion.

Concerning lack of marketability, Smith stated: "That is mostly an issue that is dealt with by business appraisers, and I am not a business appraiser but what I do know is that on sales

18

of fee simple interest there is a big market out there of people ready, willing and able to buy your property. Now, that pool has diminished quite a bit when you have a partial interest. And also the fact that there is litigation may even preclude potential investors from wanting to consider becoming a partner in [*sic*] with you. . . ."

Regarding his discovery of the Webb article, Smith testified that when he "uncovered" the article, "it was sort of the ninth inning of the game, but I came up with utilizing the Webb approach. I saw it, I digested it, I understood it and then I utilized it." Smith stated that he calculated the discounts using certain multipliers from Webb's article. When plaintiffs' counsel asked him how Webb derived the multiplier, Smith responded, "[i]t was a little over my head to be honest with you but [Webb] talked about the REIT [real estate investment trust] average cost of capital, and from that he deducted the implied yield premium which came to the 2.4%." He was not familiar with the source of the data for the multiplier. He acknowledged that the real estate investment trusts that Webb referenced in his article held eight billion dollars in assets, on average.

Plaintiffs' counsel asked Smith about a study conducted in 1998 that Smith cited in his report which found that out of 100 partial interest sales, 61 percent were sold at a discount and 39 percent were not. Smith stated he was "a little bit familiar with" this study that he cited in his report.

In the midst of cross-examination, plaintiffs' counsel moved to strike Smith's opinions in his second report on fractional interest discounts. The trial court deferred its ruling until the end of cross-examination. At that time, the court asked defendants' counsel if Smith testified that the Webb method "is

the standard for such evaluation in the industry." After hearing argument from the parties on the issue, the court allowed defendants to recall Smith. Smith reiterated that he was unaware of the Webb method until recently (less than two months before he testified at trial). Smith testified that Webb's article was peer-reviewed, but he had never used the Webb method before, and he had no knowledge of any other appraiser using the Webb method. Smith had conducted around 15 fractional interest discount analyses in his 40-year career and stated he was "very familiar with discount cash flowing." Using his "own independent research, analysis and judgment," he felt "extremely confident that Mr. Webb's methodology with respect to minority interests in income producing properties is valid."

After hearing Smith's additional testimony and further argument from the parties, the trial court granted plaintiffs' motion to strike Smith's testimony about his second report, stating: "Based on this discussion I find that the second report does not have foundation for an expert's testimony. He does not have the expertise nor the reliance upon an accepted methodology to reach the conclusions that he has in that second report, all that we are discussing right now."

Deborah Dickson, defendants' accounting expert, testified about defendants' net worth and financial condition. She is a certified public accountant, a certified fraud examiner, a master analyst in financial forensics, and holds a certification in financial forensics. Dickson opined that defendants' net worth was approximately $36,148,036 (relatively close to Wisehart's calculation of $37,969,426). Applying Smith's fractional interest discount of 19 percent (from his first report) to all of the properties in which defendants owned a partial interest, and

20

considering liquidation costs for all of the properties, Dickson opined that defendants' net worth was really $20,460,170.[7]

## VII. Judgment, Amended Judgment and Motion for New Trial

In their written closing argument on punitive damages, plaintiffs urged the trial court to "apply[] the ten percent limit" and award them 10 percent of defendants' net worth, or around $3.8 million, based on Wisehart's calculation of defendants' net worth. (Bold and italics in original omitted.) Defendants argued an appropriate award of punitive damages was between $400,000 to $750,000, "something in range of [defendants'] average [annual] net income, $578,150, or the actual amount embezzled from 2014-2016, $753,000." (Bold in original omitted.)

After taking the matter under submission, the trial court entered judgment on June 30, 2021, awarding plaintiffs $5,045,030 in punitive damages ("two times the amount of compensatory damages awarded"). The judgment is 23 pages and reads like a statement of decision, setting forth the court's findings and conclusions as to both phases of the trial. Regarding punitive damages, the court found "defendants' conduct intentionally misrepresented the true facts regarding the finances regarding those properties. They acted with a reprehensible intention to take financial advantage of the vulnerabilities of the plaintiffs, who relied upon the defendants to be honest fiduciaries and partners. For years, the defendants deceitfully misrepresented the financial condition of the

---

[7] Polly Wong also testified for defendants in the Phase 2 trial. Her testimony is not germane to our punitive damages analysis and therefore we do not summarize it here.

properties for the defendants['] own personal financial gain." The court added: "Jimmy and Polly Wong consistently and blatantly cheated their own closest relatives by pocketing large amounts of rental proceeds to which they were not entitled, falsifying and misrepresenting the property and business records, diverting funds to other family members, keeping double accounting records, failing to keep accurate records, misreporting the true amounts on records on which they reported to and knew would be reported to federal and state tax authorities and lying to cover their conduct. [¶] Even after a lengthy COVID-caused time between the liability and damages [phase] and the punitive damages phase of this protracted trial, the defendants remained indifferent to their own actions and failed to make any amends for their selfish misdeeds." The court concluded the "testimony at the punitive damages phase indicates that the defendants have substantial assets to pay punitive damages to deter future such [*sic*] reprehensible conduct." The court also stated that it found the testimony of defendants' accounting expert Dickson to be "convoluted and confusing," and her calculation of defendants' net worth "appear[ed] low."

Defendants moved for new trial, arguing the compensatory damages and punitive damages were excessive. The trial court denied the motion.

On August 27, 2021, the trial court entered a three-page "Amended Judgment," which is the final judgment in this case. Under the Amended Judgment, Jimmy Wong and Polly Wong are jointly and severally liable for the $2,522,515 compensatory damages award and the $5,045,030 punitive damages award (totaling $7,567,545), as well as $179,962.44 in prejudgment interest and $56,394.44 in costs, for a grand total of

$7,803,901.88.  Polly Wong, Jimmy Wong, Premier, and Productive are "permanently enjoined and restrained from directly or indirectly managing, maintaining or caring, at any time, for" the subject Properties.

## DISCUSSION

### I.    Compensatory Damages

The individual defendants (Jimmy and Polly Wong) contend plaintiffs' lost profits calculation, based on Wisehart's expert testimony, is too speculative to support the compensatory damages award.  Specifically, they argue (1) Wisehart improperly excluded from his net profits calculation defendants' claimed maintenance and management expenses (payments to Productive, Premier, etc.); (2) "the amount of annual maintenance expenses he did include" lacked "consistency" from year to year; and (3) Wisehart "did not rely on any actual data about the [P]roperties' income or expenses from 2007-2013 or for 2019."  Defendants also argue the tax penalties plaintiffs included in their compensatory damages calculation (based on Wisehart's testimony) were speculative because there was "no evidence that any penalties actually have been or are likely to be incurred."[8]

---

[8]  Defendants initially argued in their opening brief on appeal that Wisehart improperly included *compound* prejudgment interest in his calculation of what defendants owed plaintiffs.  In their reply brief, however, defendants abandoned this challenge to the compensatory damages award, conceding that "the trial court had discretion to include compound interest in the damages award due to [defendants'] breach of fiduciary duty."

23

An "appellate court must accept as true all evidence tending to establish the correctness of the judgment, taking into account all inferences which might reasonably have been thought by the trial court to lead to the same conclusion. [Citation.] Every substantial conflict in the testimony is to be resolved in favor of the judgment. [Citation.] Thus, the judgment of the trial court is presumed to be correct. All presumptions not contradicted by the record on appeal are indulged to support the judgment, and the appellant has the burden to affirmatively show, based on the record, the trial court's commission of reversible error." (*GHK Associates v. Mayer Group, Inc.* (1990) 224 Cal.App.3d 856, 872 (*GHK Associates*).)

### A.    Exclusion of defendants' claimed maintenance and management expenses

Defendants argue the trial court erred in adopting Wisehart's exclusion of payments to Productive, Rustic Canyon, King Leung, and Premier in the calculation of expenses to deduct from the Properties' gross profits. Defendants also argue it was error to not "replace" these excluded payments with a reasonable estimate of maintenance and management expenses to be deducted from gross profits in calculating plaintiffs' share of net profits. We reject both arguments for the following reasons.

The trial court's factual findings regarding defendants' claimed maintenance expenses—i.e., the payments to Productive, Rustic Canyon, and King Leung—are supported by substantial evidence. None of these entities had records evidencing work performed, other than handwritten invoices (e.g., documents indicating purchases of materials for maintenance and repairs, documents reflecting amount of time spent on jobs, etc.). The trial court's inferences from the evidence are reasonable: that the

24

work billed was not performed or the billings were grossly inflated. Moreover, the court's inference that these billings were a fraudulent money-making scheme for defendants and related parties is supported by the pattern of the billings and payments (e.g., nine checks written to Productive on Christmas Eve in 2015; Jason Wong's testimony that Rustic Craftsman served as a billing entity for Productive at a time when Productive was also submitting its own billings). The court did not err in concluding Wisehart properly declined to treat these payments as legitimate, reasonable expenses of the Properties.

Defendants fault Wisehart and the trial court for failing to "replace" the improper payments to Productive, Rustic Canyon, King Leung, and Premier with an estimate of "reasonable expenses" of the Properties. As discussed above, the trial court found the payments to the contractors were part of defendants' fraudulent scheme and the work did not occur or was grossly inflated; and we concluded these findings are supported by substantial evidence. In any event, defendants did not present any evidence in the Phase 1 liability and compensatory damages trial regarding a reasonable amount of maintenance/repair expenses for the Properties to "replace" the illegitimate amounts charged by Productive, Rustic Craftsman, and King Leung.[9]

---

[9] In support of their argument regarding replacement expenses for maintenance, defendants reference the testimony of Sommer, plaintiffs' expert real estate appraiser, who appraised three of defendants' properties for purposes of establishing defendants' net worth in the Phase 2 punitive damages trial. As part of his appraisal, he estimated expenses for the three properties he appraised (only one of which is co-owned with

25

Defendants complain that the amount of maintenance/repair expenses Wisehart gave them credit for varied widely from year to year over the five-year period for which defendants produced complete financial records. This was not a flaw in Wisehart's methodology. As explained above, Wisehart credited legitimate, reasonable maintenance/repair expenses documented in the financial records defendants produced. Without evidence of other legitimate, reasonable expenses (or an estimate of such), the trial court did not err in crediting Wisehart's methodology.

Turning to the payments to Premier, the trial court concluded these payments from the Properties' bank accounts should be disgorged, based on the court's finding that Premier, a fiduciary wholly owned by Polly Wong, participated in the embezzlement and fraud scheme. "Disgorgement of profits is particularly applicable in cases dealing with breach of fiduciary duty, and is a logical extension of the principle that . . . fiduciaries cannot profit by a breach of their duty." (*County of San Bernardino v. Walsh* (2007) 158 Cal.App.4th 533, 543.) Substantial evidence demonstrates Premier collected management fees while it embezzled the cash rental payments from the Properties; made payments to Productive, etc. from the Properties' bank accounts for maintenance and repair services not performed; made unauthorized payments from the Properties' bank accounts to the individual defendants and for the benefit of the individual defendants (e.g., a BMW for Polly Wong); and prepared false operating statements for the Properties to hide

plaintiffs). This testimony has no application to the present discussion because it was not presented in the Phase 1 liability and compensatory damages trial.

26

defendants' embezzlement scheme.  Accordingly, the trial court did not err in declining to treat the payments to Premier as legitimate, reasonable expenses of the Properties.

Defendants assert disgorgement of profits requires a deduction for reasonable expenses, and they argue Wisehart and the trial court should have deducted a reasonable management fee.  (See, e.g., *Liu v. Securities and Exchange Commission* (2020) 140 S.Ct. 1936, 1950 ["It is true that when the 'entire profit of a business or undertaking' results from the wrongdoing, a defendant may be denied 'inequitable deductions' such as for personal services.  [Citation.]  But that exception requires ascertaining whether expenses are legitimate or whether they are merely wrongful gains 'under another name.'  [Citation.]  Doing so will ensure that any disgorgement award falls within the limits of equity practice while preventing defendants from profiting from their own wrong"].)  "In measuring the amount of the defendant's unjust enrichment, the plaintiff may present evidence of the total or gross amount of the benefit, or a reasonable approximation thereof, and then the defendant may present evidence of costs, expenses, and other deductions to show the actual or net benefit the defendant received.  'The party seeking disgorgement "has the burden of producing evidence permitting at least a reasonable approximation of the amount of the wrongful gain," ' and the ' "[r]esidual risk of uncertainty in calculating net profit is assigned to the wrongdoer." ' "  (*Meister v. Mensinger* (2014) 230 Cal.App.4th 381, 399.)  Here, plaintiffs sought disgorgement of all management fees paid to Premier out of the Properties' bank accounts as wrongful gain, contending Premier (wholly owned by Polly Wong) used its position as property manager to help the individual defendants embezzle the

27

Properties' profits; it provided no legitimate (lawful) services; and it should not be permitted to profit from its wrongful acts. To the extent defendants contend some of Premier's management services were legitimate and not part of the wrongful scheme, Premier did not produce underlying documentation in response to plaintiffs' document requests evidencing its services, as Wisehart testified. Thus, there was no evidence Premier engaged in any legitimate services that should be treated as proper expenses, and the trial court did not err in denying defendants credit for unproven reasonable management fees.

We note that the trial court did not explain in its statement of decision how it calculated the $2,522,515 figure it awarded plaintiffs in compensatory damages. Wisehart testified that the total amount due and payable to plaintiffs was $4,801,027, consisting of (1) plaintiffs' collective proportional share of the Properties' net profits from 2007 through 2019 in the amount of $2,747,332; (2) prejudgment interest on that amount, or $1,463,831; and (3) $589,864 in tax penalties that plaintiffs would incur. The trial court did not indicate in the statement of decision that it disagreed with any part of Wisehart's methodology or any of his figures, but the court discounted plaintiffs' damages calculation by $2,278.512. On appeal, defendants challenge plaintiffs' compensatory damages calculation without taking into account the court's discounted award and its relation to defendants' arguments regarding the propriety of amounts awarded as compensatory damages. For example, in light of our conclusion that defendants did not show that Wisehart's methodology for calculating profits is improper, even if we had concluded that defendants' claimed maintenance and management expenses should have been subtracted from

28

gross profits, defendants do not explain why the compensatory damages award should be modified. The trial court steeply discounted Wisehart's damages calculation in an amount greater than any reduction that would result from inclusion of defendants' claimed expenses. Thus, the compensatory damages would still be supported absent exclusion of the maintenance and management expenses.

### B. Wisehart's methodology for calculating profits in the absence of adequate financial records

Defendants criticize the extrapolation methodology Wisehart applied for calculating plaintiffs' share of the Properties' net profits for 2007 through 2013 and 2019. First, defendants complain that Wisehart "did not rely on any actual data." Defendants, who were responsible for managing and maintaining the Properties, did not produce the data for these years in response to plaintiffs' document requests. Defendants appear to claim that plaintiffs are entitled to profits for five years only (2014-2018) because *defendants* failed to produce adequate records from which a forensic audit could be conducted on the other eight years (2007-2013 & 2019). Such a claim is without merit. Defendants do not explain why, in the absence of records they failed to produce, Wisehart's extrapolation methodology is not a suitable method for calculating profits. (See, e.g., *Orozco v. WPV San Jose, LLC* (2019) 36 Cal.App.5th 375, 397-398 [concluding trial court did not abuse its discretion in admitting expert witness testimony where the expert witness "relied on

29

actual sales data" and "made logical extrapolations of that data to arrive at his conclusions" regarding lost profits].)[10]

"Where the *fact* of damages is certain, the amount of damages need not be calculated with absolute certainty. [Citations.]  The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation. [Citation.]  This is especially true where, as here, it is the wrongful acts of the defendant that have created the difficulty in proving the amount of loss of profits." (*GHK Associates*, *supra*, 224 Cal.App.3d 856, 873-874; *Asahi Kasei Pharma Corp. v. Actelion Ltd.* (2013) 222 Cal.App.4th 945, 975 ["once the occurrence of lost profits is established a plaintiff has greater leeway in establishing the extent of lost profits, particularly if the defendant was shown to have prevented the relevant data from being collected through its wrongful behavior"].)

### C.    Plaintiffs' Expected Tax penalties

To the extent the trial court's compensatory damages award includes an allowance for plaintiffs' projected tax penalties, defendants' challenge to the propriety of such an amount is without merit.  Defendants argue there was "no evidence that any penalties actually have been or are likely to be

---

[10]   Defendants rely on cases in which appellate courts concluded lost profits analyses for *unestablished* ventures or businesses were speculative.  (See, e.g., *Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739; *Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870.)  That is very different from this case where Wisehart used existing data from established income-generating properties and made logical extrapolations from the existing data.

incurred." Not so. Wisehart, a certified public accountant, calculated the penalties plaintiffs will incur for underreporting their income (due to defendants' wrongdoing) when they file their amended tax returns. Indeed, defendants' accounting expert did not dispute the amount or state that such penalties would not be incurred. Moreover, the evidence showed that by the time of trial, the individual defendants, themselves, had already filed amended tax returns that reflected the prior substantial underreporting of income from the Properties.

Based on the foregoing, defendants have not demonstrated error with respect to the compensatory damages award.

## II. Punitive Damages

The individual defendants concede that plaintiffs are entitled to an award of punitive damages. Defendants contend, however, that the $5,045,030 punitive damages award (double the compensatory damages award) is "grossly excessive" and "raises a presumption of passion and prejudice" under state law because (1) it exceeds 10 percent of defendants' net worth, using plaintiffs' calculation of defendants' net worth; (2) it "wipes out almost a decade of defendants' net income"; and (3) in combination with the $2,522,515 compensatory damages award, it equals $1 million more than the value of defendants' liquid assets, using plaintiffs' calculation of defendants' liquid assets. Defendants also contend the punitive damages award violates federal due process principles because it exceeds the amount of the compensatory damages award. Finally, defendants contend the punitive damages award is not supported by substantial evidence of their ability to pay "without being financially destroyed" because (1) it "forces defendants to sell properties to pay the [entire] judgment, but the award does not consider the

31

properties' liquidation costs"; and (2) it does not "account for the discounted value of defendants' fractional property interests." Defendants also assert the trial court committed reversible error when it struck their expert's (Smith's) testimony regarding his second report on fractional interest discounts.

"When faced with a challenge to the amount of a punitive damages award, our traditional function has been to determine whether the award is excessive as a matter of law or raises a presumption that it is the product of passion or prejudice." (*Adams v. Murakami* (1991) 54 Cal.3d 105, 109-110.) "In so doing, we evaluate the award under three criteria: the nature of the defendant's wrongdoing; the actual harm to the plaintiff; and the defendant's wealth." (*Bankhead v. ArvinMeritor, Inc.* (2012) 205 Cal.App.4th 68, 77 (*Bankhead*).) "Because the quintessence of punitive damages is to deter future misconduct by the defendant, the key question before the reviewing court is whether the amount of damages 'exceeds the level necessary to properly punish and deter.'" (*Adams*, at p. 110.)

In the trial court, plaintiffs took the position that an award of punitive damages equal to 10 percent of the individual defendants' net worth was the upper "limit" the court should impose in this case. In their written closing argument on the punitive damages phase of trial, plaintiffs explained, in pertinent part: "A line of California cases indicate that if the statement of a defendant's net worth presents a reliable measure of the defendant's financial condition, then punitive damages generally should not exceed ten percent of the defendant's net worth." We agree with this analysis of California case law. (See, e.g., *Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 308 [" 'Punitive damages constitute a windfall. [Citation.] Such awards

generally are not allowed to exceed 10 percent of the net worth of the defendant' "]; *Sierra Club Foundation v. Graham* (1999) 72 Cal.App.4th 1135, 1163 [affirming punitive damages award equal to two or three percent of the defendant's net worth, noting the award was "far less than the 10 percent cap generally recognized by our courts"].)

Plaintiffs further explained in their written closing argument: "Given that Mr. Wisehart's report presents a reliable statement of [d]efendants' net worth, it would be appropriate for a ten percent limitation to apply here." Wisehart testified that the individual defendants' net worth was approximately $38,000,000. Accordingly, plaintiffs urged the trial court to award them around $3.8 million in punitive damages, or 10 percent of net worth. The trial court awarded $5,045,030, or around 13 percent of defendants' net worth.

On appeal, plaintiffs urge us to affirm the punitive damages award, pointing to cases where awards exceeding 10 percent of net worth were upheld. But those cases are consistent with the principle set forth above that where the statement of a defendant's net worth presents a reliable measure of the defendant's financial condition, punitive damages generally should not exceed 10 percent of the defendant's net worth. (See. e.g., *Bankhead, supra,* 205 Cal.App.4th at pp. 82-83 ["reject[ing] the [defendant's] argument that 10 percent of net worth constitutes a ceiling above which juries may not go in setting the amount of punitive damages" where expert's "uncontroverted testimony" showed that the defendant "was far wealthier than its stated net worth would indicate, and that net worth alone is an untrustworthy standard, because it is so easily manipulated"]; *Zaxis Wireless Communications, Inc. v. Motor Sound Corp.* (2001)

33

89 Cal.App.4th 577, 583 [affirming punitive damages award of $300,000 where the defendant had negative net worth on paper but "had a credit line of $50 million of which $5.3 million was unexpended"].)

We agree with defendants that the trial court erred in awarding punitive damages in an amount greater than 10 percent of the individual defendants' net worth. Although defendants engaged in reprehensible conduct, a punitive damages award of $5,045,030, around 13 percent of defendants' net worth, exceeds the level necessary to punish defendants and deter future misconduct, especially in light of the substantial compensatory damages award of $2,522,515. For these reasons, we conclude that a punitive damages award of more than the generally accepted 10 percent is excessive as a matter of law, and we reduce it accordingly to $3,796,943, or 10 percent of Wisehart's calculation of defendants' net worth.

For the reasons explained below, we reject defendants' arguments in support of a further reduction of punitive damages to an amount below 10 percent of their net worth.

A. **Due process concerns**

First, we disagree with defendants' contention that a punitive damages award in excess of compensatory damages violates due process in this case. We review this contention de novo. (*Jet Source Charter, Inc. v. Doherty* (2007) 148 Cal.App.4th 1, 8.) " 'Our jurisprudence and the principles it has now established demonstrate . . . that, in practice, fee awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.' " (*Id.* at p. 9.) "When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can

34

reach the outermost limit of the due process guarantee. The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." (*Id*. at p. 10.) Here, the reduced punitive damages award will equal around 1.5 times the compensatory damages award. We cannot conclude this ratio violates due process based on the circumstances of this case, where defendants systematically embezzled profits from their family members for more than a decade.

### B. Liquidation costs and fractional interest discounts

Next, we reject defendants' contentions that the punitive damages award is not supported by substantial evidence of their ability to pay "without being financially destroyed" because (1) it "forces defendants to sell properties to pay the [entire] judgment, but the award does not consider the properties' liquidation costs"; and (2) it does not "account for the discounted value of defendants' fractional property interests." We note that the reduced punitive damages award will not require defendants to sell properties, as their liquid assts are sufficient to pay the modified judgment.

And we have no cause to disturb the trial court's rejection of defendants' claim for fractional interest discounts in calculating their net worth. The trial court apparently accepted Wisehart's net worth methodology, which did not include fractional interest discounts. Defendants conceded that such a discount is not always appropriate by Smith's reference to a 1998 study, in which 31 percent of the fractional interests surveyed were *not* sold at a discount. Moreover, Sommer testified that Smith's 19 percent fractional interest discount analysis was

35

flawed in that Smith did not adequately compare the subject properties to the purported comparables to justify a fractional interest discount *as to the Properties in this case.* Based on the evidence before it, the trial court did not err in rejecting defendants' fractional interest discount claim.

We disagree with defendants' assertion that the trial court erred in excluding Smith's testimony regarding his second report (the March 2021 report) on fractional interest discounts based on the Web method. The court found that Smith did not have the expertise to give the opinions in the second report, and the opinions were not based on "an accepted methodology." We note that this was a bench trial, and the court heard the entirety of Smith's testimony before excluding the portion based on the second report.

The " 'trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative.' " (*Zuniga v. Alexandria Care Center, LLC* (2021) 67 Cal.App.5th 871, 886.) " 'The trial court's preliminary determination whether the expert opinion is founded on sound logic is not a decision on its persuasiveness. The court must not weigh an opinion's probative value or substitute its own opinion for the expert's opinion. Rather, the court must simply determine whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture. . . . The goal of trial court gatekeeping is simply to exclude "clearly invalid and unreliable" expert opinion.' " (*Ibid*.) We review the trial court's ruling for abuse of discretion. (*Ibid*.)

The trial court did not abuse its discretion.  This was Smith's first time applying the Webb method, which he had only recently discovered, and he was unaware of the Webb method ever being used in a case like the present.  He could not fully explain how Webb derived the multiplier used to calculate the discounts, acknowledging, "[i]t was a little over my head to be honest with you."  Nor was he familiar with the source of the data for the multiplier.  And he could not articulate why the multiplier Webb used in relation to REITs was applicable to the Properties at issue here.  In short, Smith's application of the Webb method was unreliable and speculative, and the trial court did not abuse its discretion in excluding this portion of Smith's testimony.

## III.   Permanent Injunction

The permanent injunction in this case provides that Polly Wong, Jimmy Wong, Premier, and Productive are "permanently enjoined and restrained from directly or indirectly managing, maintaining or caring, at any time, for" the subject Properties.  Defendants contend the permanent injunction is overbroad, in that it "includes no time, place, or manner restrictions," and it is "totally unnecessary to prevent defendants from repeating their past wrongs."  They assert:  "No matter what, neither Jimmy and Polly Wong nor anybody in any way associated with them, can ever do anything to safeguard their own property.  They cannot hire workers to perform needed repairs, or pay workers who have done legitimate work.  They cannot pay mortgages or property taxes, or take any other action to prevent foreclosure.  And although defendants may in some circumstances be able to seek modification of the injunction in the trial court, there is nothing they can do to respond to an emergency such as a break-in, a fire, or a flood."

In support of their assertion the injunction is overbroad, defendants cite one case, *Balboa Island Village Inn, Inc. v. Lemen* (2007) 40 Cal.4th 1141, 1160, in which our Supreme Court concluded an injunction preventing speech was "broader than necessary to provide relief to plaintiff while minimizing the restriction of expression." The case is not instructive here. Defendants, due to their breaches of fiduciary duty, fraud, and other misdeeds, have been removed of the responsibility of managing and maintaining the Properties. The Properties are under new management. There is no reason for defendants to manage, maintain, or care for the Properties. The injunction properly prevents defendants from continuing to engage in the wrongdoing of which they have been found liable in this action or the opportunity to do so in the future. It is not impermissibly overbroad.

## DISPOSITION

The award of punitive damages is reduced to $3,796,943, and the judgment is affirmed as so modified. Each side is to bear its own costs on appeal.

NOT TO BE PUBLISHED

                                                        CHANEY, J.

We concur:


ROTHSCHILD, P. J.                 WEINGART, J.